# SOUTH CAROLINA *v.* KATZENBACH, ATTORNEY GENERAL.

No. 22, Orig.   Argued January 17–18, 1966.—Decided March 7, 1966.

304

*David W. Robinson II* and *Daniel R. McLeod,* Attorney General of South Carolina, argued the cause for the plaintiff. With them on the brief was *David W. Robinson.*

*Attorney General Katzenbach,* defendant, argued the cause *pro se.* With him on the brief were *Solicitor General Marshall, Assistant Attorney General Doar, Ralph S. Spritzer, Louis F. Claiborne, Robert S. Rifkind, David L. Norman* and *Alan G. Marer.*

*R. D. McIlwaine III,* Assistant Attorney General, argued the cause for the Commonwealth of Virginia, as *amicus curiae,* in support of the plaintiff. With him on the brief were *Robert Y. Button,* Attorney General, and *Henry T. Wickham. Jack P. F. Gremillion,* Attorney General, argued the cause for the State of Louisiana, as *amicus curiae,* in support of the plaintiff. With him on the brief were *Harry J. Kron,* Assistant Attorney General, *Thomas W. McFerrin, Sr., Sidney W. Provensal, Jr.,* and *Alfred Avins. Richmond M. Flowers,* Attorney General, and *Francis J. Mizell, Jr.,* argued the cause for

the State of Alabama, as *amicus curiae,* in support of the plaintiff. With them on the briefs were *George C. Wallace,* Governor of Alabama, *Gordon Madison,* Assistant Attorney General, and *Reid B. Barnes. Joe T. Patterson,* Attorney General, and *Charles Clark,* Special Assistant Attorney General, argued the cause for the State of Mississippi, as *amicus curiae,* in support of the plaintiff. With them on the brief was *Dugas Shands,* Assistant Attorney General. *E. Freeman Leverett,* Deputy Assistant Attorney General, argued the cause for the State of Georgia, as *amicus curiae,* in support of the plaintiff. With him on the brief was *Arthur K. Bolton,* Attorney General.

*Levin H. Campbell,* Assistant Attorney General, and *Archibald Cox,* Special Assistant Attorney General, argued the cause for the Commonwealth of Massachusetts, as *amicus curiae,* in support of the defendant. With *Mr. Campbell* on the brief was *Edward W. Brooke,* Attorney General, joined by the following States through their Attorneys General and other officials as follows: *Bert T. Kobayashi* of Hawaii; *John J. Dillon* of Indiana, *Theodore D. Wilson,* Assistant Attorney General, and *John O. Moss,* Deputy Attorney General; *Lawrence F. Scalise* of Iowa; *Robert C. Londerholm* of Kansas; *Richard J. Dubord* of Maine; *Thomas B. Finan* of Maryland; *Frank J. Kelley* of Michigan, and *Robert A. Derengoski,* Solicitor General; *Forrest H. Anderson* of Montana; *Arthur J. Sills* of New Jersey; *Louis J. Lefkowitz* of New York; *Charles Nesbitt* of Oklahoma, and *Charles L. Owens,* Assistant Attorney General; *Robert Y. Thornton* of Oregon; *Walter E. Alessandroni* of Pennsylvania; *J. Joseph Nugent* of Rhode Island; *John P. Connarn* of Vermont; *C. Donald Robertson* of West Virginia; and *Bronson C. LaFollette* of Wisconsin. *Alan B. Handler,* First Assistant Attorney General, argued the cause for the State of New Jersey, as *amicus curiae,* in

support of the defendant. Briefs of *amici curiae,* in support of the defendant, were filed by *Thomas C. Lynch,* Attorney General, *Miles J. Rubin,* Senior Assistant Attorney General, *Dan Kaufmann,* Assistant Attorney General, and *Charles B. McKesson, David N. Rakov* and *Philip M. Rosten,* Deputy Attorneys General, for the State of California; and by *William G. Clark,* Attorney General, *Richard E. Friedman,* First Assistant Attorney General, and *Richard A. Michael* and *Philip J. Rock,* Assistant Attorneys General, for the State of Illinois.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

By leave of the Court, 382 U. S. 898, South Carolina has filed a bill of complaint, seeking a declaration that selected provisions of the Voting Rights Act of 1965 [1] violate the Federal Constitution, and asking for an injunction against enforcement of these provisions by the Attorney General. Original jurisdiction is founded on the presence of a controversy between a State and a citizen of another State under Art. III, § 2, of the Constitution. See *Georgia* v. *Pennsylvania R. Co.,* 324 U. S. 439. Because no issues of fact were raised in the complaint, and because of South Carolina's desire to obtain a ruling prior to its primary elections in June 1966, we dispensed with appointment of a special master and expedited our hearing of the case.

Recognizing that the questions presented were of urgent concern to the entire country, we invited all of the States to participate in this proceeding as friends of the Court. A majority responded by submitting or joining in briefs on the merits, some supporting South Carolina and others the Attorney General.[2] Seven of these States

---

[1] 79 Stat. 437, 42 U. S. C. § 1973 (1964 ed., Supp. I).

[2] States supporting South Carolina: Alabama, Georgia, Louisiana, Mississippi, and Virginia. States supporting the Attorney General: California, Illinois, and Massachusetts, joined by Hawaii, Indiana,

also requested and received permission to argue the case orally at our hearing. Without exception, despite the emotional overtones of the proceeding, the briefs and oral arguments were temperate, lawyerlike and constructive. All viewpoints on the issues have been fully developed, and this additional assistance has been most helpful to the Court.

The Voting Rights Act was designed by Congress to banish the blight of racial discrimination in voting, which has infected the electoral process in parts of our country for nearly a century. The Act creates stringent new remedies for voting discrimination where it persists on a pervasive scale, and in addition the statute strengthens existing remedies for pockets of voting discrimination elsewhere in the country. Congress assumed the power to prescribe these remedies from § 2 of the Fifteenth Amendment, which authorizes the National Legislature to effectuate by "appropriate" measures the constitutional prohibition against racial discrimination in voting. We hold that the sections of the Act which are properly before us are an appropriate means for carrying out Congress' constitutional responsibilities and are consonant with all other provisions of the Constitution. We therefore deny South Carolina's request that enforcement of these sections of the Act be enjoined.

I.

The constitutional propriety of the Voting Rights Act of 1965 must be judged with reference to the historical experience which it reflects. Before enacting the measure, Congress explored with great care the problem of racial discrimination in voting. The House and Senate Committees on the Judiciary each held hearings for nine days and received testimony from a total of 67 wit-

Iowa, Kansas, Maine, Maryland, Michigan, Montana, New Hampshire, New Jersey, New York, Oklahoma, Oregon, Pennsylvania, Rhode Island, Vermont, West Virginia, and Wisconsin.

nesses.[3] More than three full days were consumed discussing the bill on the floor of the House, while the debate in the Senate covered 26 days in all.[4] At the close of these deliberations, the verdict of both chambers was overwhelming. The House approved the bill by a vote of 328–74, and the measure passed the Senate by a margin of 79–18.

Two points emerge vividly from the voluminous legislative history of the Act contained in the committee hearings and floor debates. First: Congress felt itself confronted by an insidious and pervasive evil which had been perpetuated in certain parts of our country through unremitting and ingenious defiance of the Constitution. Second: Congress concluded that the unsuccessful remedies which it had prescribed in the past would have to be replaced by sterner and more elaborate measures in order to satisfy the clear commands of the Fifteenth Amendment. We pause here to summarize the majority reports of the House and Senate Committees, which document in considerable detail the factual basis for these reactions by Congress.[5] See H. R. Rep. No. 439, 89th Cong., 1st Sess., 8–16 (hereinafter cited as House Report); S. Rep. No. 162, pt. 3, 89th Cong., 1st Sess., 3–16 (hereinafter cited as Senate Report).

---

[3] See Hearings on H. R. 6400 before Subcommittee No. 5 of the House Committee on the Judiciary, 89th Cong., 1st Sess. (hereinafter cited as House Hearings); Hearings on S. 1564 before the Senate Committee on the Judiciary, 89th Cong., 1st Sess. (hereinafter cited as Senate Hearings).

[4] See the Congressional Record for April 22, 23, 26, 27, 28, 29, 30; May 3, 4, 5, 6, 7, 10, 11, 12, 13, 14, 17, 18, 19, 20, 21, 24, 25, 26; July 6, 7, 8, 9; August 3 and 4, 1965.

[5] The facts contained in these reports are confirmed, among other sources, by *United States* v. *Louisiana,* 225 F. Supp. 353, 363–385 (Wisdom, J.), aff'd, 380 U. S. 145; *United States* v. *Mississippi,* 229 F. Supp. 925, 983–997 (dissenting opinion of Brown, J.), rev'd and rem'd, 380 U. S. 128; *United States* v. *Alabama,* 192 F. Supp. 677

The Fifteenth Amendment to the Constitution was ratified in 1870. Promptly thereafter Congress passed the Enforcement Act of 1870,[6] which made it a crime for public officers and private persons to obstruct exercise of the right to vote. The statute was amended in the following year[7] to provide for detailed federal supervision of the electoral process, from registration to the certification of returns. As the years passed and fervor for racial equality waned, enforcement of the laws became spotty and ineffective, and most of their provisions were repealed in 1894.[8] The remnants have had little significance in the recently renewed battle against voting discrimination.

Meanwhile, beginning in 1890, the States of Alabama, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Virginia enacted tests still in use which were specifically designed to prevent Negroes from voting.[9] Typically, they made the ability to read and write

---

(Johnson, J.), aff'd, 304 F. 2d 583, aff'd, 371 U. S. 37; Comm'n on Civil Rights, Voting in Mississippi; 1963 Comm'n on Civil Rights Rep., Voting; 1961 Comm'n on Civil Rights Rep., Voting, pt. 2; 1959 Comm'n on Civil Rights Rep., pt. 2. See generally Christopher, The Constitutionality of the Voting Rights Act of 1965, 18 Stan. L. Rev. 1; Note, Federal Protection of Negro Voting Rights, 51 Va. L. Rev. 1051.

[6] 16 Stat. 140.

[7] 16 Stat. 433.

[8] 28 Stat. 36.

[9] The South Carolina Constitutional Convention of 1895 was a leader in the widespread movement to disenfranchise Negroes. Key, Southern Politics, 537–539. Senator Ben Tillman frankly explained to the state delegates the aim of the new literacy test: "[T]he only thing we can do as patriots and as statesmen is to take from [the 'ignorant blacks'] every ballot that we can under the laws of our national government." He was equally candid about the exemption from the literacy test for persons who could "understand" and "explain" a section of the state constitution: "There is no particle of fraud or illegality in it. It is just simply showing partiality, perhaps, [laughter,] or discriminating." He described the alternative exemp-

a registration qualification and also required completion of a registration form. These laws were based on the fact that as of 1890 in each of the named States, more than two-thirds of the adult Negroes were illiterate while less than one-quarter of the adult whites were unable to read or write.[10] At the same time, alternate tests were prescribed in all of the named States to assure that white illiterates would not be deprived of the franchise. These included grandfather clauses, property qualifications, "good character" tests, and the requirement that registrants "understand" or "interpret" certain matter.

The course of subsequent Fifteenth Amendment litigation in this Court demonstrates the variety and persistence of these and similar institutions designed to deprive Negroes of the right to vote. Grandfather clauses were invalidated in *Guinn* v. *United States,* 238 U. S. 347, and *Myers* v. *Anderson,* 238 U. S. 368. Procedural hurdles were struck down in *Lane* v. *Wilson,* 307 U. S. 268. The white primary was outlawed in *Smith* v. *Allwright,* 321 U. S. 649, and *Terry* v. *Adams,* 345 U. S. 461. Improper challenges were nullified in *United States* v. *Thomas,* 362 U. S. 58. Racial gerrymandering was forbidden by *Gomillion* v. *Lightfoot,* 364 U. S. 339. Finally, discriminatory application of voting tests was condemned in *Schnell* v. *Davis,* 336 U. S. 933; *Alabama*

---

tion for persons paying state property taxes in the same vein: "By means of the $300 clause you simply reach out and take in some more white men and a few more colored men." Journal of the Constitutional Convention of the State of South Carolina 464, 469, 471 (1895). Senator Tillman was the dominant political figure in the state convention, and his entire address merits examination.

[10] Prior to the Civil War, most of the slave States made it a crime to teach Negroes how to read or write. Following the war, these States rapidly instituted racial segregation in their public schools. Throughout the period, free public education in the South had barely begun to develop. See *Brown* v. *Board of Education,* 347 U. S. 483, 489–490, n. 4; 1959 Comm'n on Civil Rights Rep. 147–151.

v. *United States,* 371 U. S. 37; and *Louisiana* v. *United States,* 380 U. S. 145.

According to the evidence in recent Justice Department voting suits, the latter stratagem is now the principal method used to bar Negroes from the polls. Discriminatory administration of voting qualifications has been found in all eight Alabama cases, in all nine Louisiana cases, and in all nine Mississippi cases which have gone to final judgment.[11] Moreover, in almost all of these cases, the courts have held that the discrimination was pursuant to a widespread "pattern or practice." White applicants for registration have often been excused altogether from the literacy and understanding tests or have been given easy versions, have received extensive help from voting officials, and have been registered despite serious errors in their answers.[12] Negroes, on the other hand, have typically been required to pass difficult versions of all the tests, without any outside assistance and without the slightest error.[13] The good-morals require-

---

[11] For example, see three voting suits brought against the States themselves: *United States* v. *Alabama,* 192 F. Supp. 677, aff'd, 304 F. 2d 583, aff'd, 371 U. S. 37; *United States* v. *Louisiana,* 225 F. Supp. 353, aff'd, 380 U. S. 145; *United States* v. *Mississippi,* 339 F. 2d 679.

[12] A white applicant in Louisiana satisfied the registrar of his ability to interpret the state constitution by writing, "FRDUM FOOF SPETGH." *United States* v. *Louisiana,* 225 F. Supp. 353, 384. A white applicant in Alabama who had never completed the first grade of school was enrolled after the registrar filled out the entire form for him. *United States* v. *Penton,* 212 F. Supp. 193, 210–211.

[13] In Panola County, Mississippi, the registrar required Negroes to interpret the provision of the state constitution concerning "the rate of interest on the fund known as the 'Chickasaw School Fund.'" *United States* v. *Duke,* 332 F. 2d 759, 764. In Forrest County, Mississippi, the registrar rejected six Negroes with baccalaureate degrees, three of whom were also Masters of Arts. *United States* v. *Lynd,* 301 F. 2d 818, 821.

ment is so vague and subjective that it has constituted an open invitation to abuse at the hands of voting officials.[14]  Negroes obliged to obtain vouchers from registered voters have found it virtually impossible to comply in areas where almost no Negroes are on the rolls.[15]

In recent years, Congress has repeatedly tried to cope with the problem by facilitating case-by-case litigation against voting discrimination.  The Civil Rights Act of 1957 [16] authorized the Attorney General to seek injunctions against public and private interference with the right to vote on racial grounds.  Perfecting amendments in the Civil Rights Act of 1960 [17] permitted the joinder of States as parties defendant, gave the Attorney General access to local voting records, and authorized courts to register voters in areas of systematic discrimination. Title I of the Civil Rights Act of 1964 [18] expedited the hearing of voting cases before three-judge courts and outlawed some of the tactics used to disqualify Negroes from voting in federal elections.

Despite the earnest efforts of the Justice Department and of many federal judges, these new laws have done little to cure the problem of voting discrimination. According to estimates by the Attorney General during hearings on the Act, registration of voting-age Negroes in Alabama rose only from 14.2% to 19.4% between 1958 and 1964; in Louisiana it barely inched ahead from 31.7% to 31.8% between 1956 and 1965; and in Mississippi it increased only from 4.4% to 6.4% between 1954 and 1964.  In each instance, registration of voting-age whites ran roughly 50 percentage points or more ahead of Negro registration.

[14] For example, see *United States* v. *Atkins,* 323 F. 2d 733, 743.
[15] For example, see *United States* v. *Logue,* 344 F. 2d 290, 292.
[16] 71 Stat. 634.
[17] 74 Stat. 86.
[18] 78 Stat. 241, 42 U. S. C. § 1971 (1964 ed.).

314

The previous legislation has proved ineffective for a number of reasons. Voting suits are unusually onerous to prepare, sometimes requiring as many as 6,000 man-hours spent combing through registration records in preparation for trial. Litigation has been exceedingly slow, in part because of the ample opportunities for delay afforded voting officials and others involved in the proceedings. Even when favorable decisions have finally been obtained, some of the States affected have merely switched to discriminatory devices not covered by the federal decrees or have enacted difficult new tests designed to prolong the existing disparity between white and Negro registration.[19] Alternatively, certain local officials have defied and evaded court orders or have simply closed their registration offices to freeze the voting rolls.[20] The provision of the 1960 law authorizing registration by federal officers has had little impact on local maladministration because of its procedural complexities.

During the hearings and debates on the Act, Selma, Alabama, was repeatedly referred to as the pre-eminent example of the ineffectiveness of existing legislation. In Dallas County, of which Selma is the seat, there were four years of litigation by the Justice Department and two findings by the federal courts of widespread voting discrimination. Yet in those four years, Negro registra-

---

[19] The Court of Appeals for the Fifth Circuit ordered the registrars of Forrest County, Mississippi, to give future Negro applicants the same assistance which white applicants had enjoyed in the past, and to register future Negro applicants despite errors which were not serious enough to disqualify white applicants in the past. The Mississippi Legislature promptly responded by requiring applicants to complete their registration forms without assistance or error, and by adding a good-morals and public-challenge provision to the registration laws. *United States* v. *Mississippi*, 229 F. Supp. 925, 996–997 (dissenting opinion).

[20] For example, see *United States* v. *Parker*, 236 F. Supp. 511; *United States* v. *Palmer*, 230 F. Supp. 716.

tion rose only from 156 to 383, although there are approximately 15,000 Negroes of voting age in the county. Any possibility that these figures were attributable to political apathy was dispelled by the protest demonstrations in Selma in the early months of 1965. The House Committee on the Judiciary summed up the reaction of Congress to these developments in the following words:

> "The litigation in Dallas County took more than 4 years to open the door to the exercise of constitutional rights conferred almost a century ago. The problem on a national scale is that the difficulties experienced in suits in Dallas County have been encountered over and over again under existing voting laws. Four years is too long. The burden is too heavy—the wrong to our citizens is too serious—the damage to our national conscience is too great not to adopt more effective measures than exist today.
>
> "Such is the essential justification for the pending bill." House Report 11.

## II.

The Voting Rights Act of 1965 reflects Congress' firm intention to rid the country of racial discrimination in voting.[21] The heart of the Act is a complex scheme of stringent remedies aimed at areas where voting discrimination has been most flagrant. Section 4 (a)–(d) lays down a formula defining the States and political subdivisions to which these new remedies apply. The first of the remedies, contained in § 4 (a), is the suspension of literacy tests and similar voting qualifications for a period of five years from the last occurrence of substantial voting discrimination. Section 5 prescribes a second

---

[21] For convenient reference, the entire Act is reprinted in an Appendix to this opinion.

remedy, the suspension of all new voting regulations pending review by federal authorities to determine whether their use would perpetuate voting discrimination. The third remedy, covered in §§ 6 (b), 7, 9, and 13 (a), is the assignment of federal examiners on certification by the Attorney General to list qualified applicants who are thereafter entitled to vote in all elections.

Other provisions of the Act prescribe subsidiary cures for persistent voting discrimination. Section 8 authorizes the appointment of federal poll-watchers in places to which federal examiners have already been assigned. Section 10 (d) excuses those made eligible to vote in sections of the country covered by § 4 (b) of the Act from paying accumulated past poll taxes for state and local elections. Section 12 (e) provides for balloting by persons denied access to the polls in areas where federal examiners have been appointed.

The remaining remedial portions of the Act are aimed at voting discrimination in any area of the country where it may occur. Section 2 broadly prohibits the use of voting rules to abridge exercise of the franchise on racial grounds. Sections 3, 6 (a), and 13 (b) strengthen existing procedures for attacking voting discrimination by means of litigation. Section 4 (e) excuses citizens educated in American schools conducted in a foreign language from passing English-language literacy tests. Section 10 (a)–(c) facilitates constitutional litigation challenging the imposition of all poll taxes for state and local elections. Sections 11 and 12 (a)–(d) authorize civil and criminal sanctions against interference with the exercise of rights guaranteed by the Act.

At the outset, we emphasize that only some of the many portions of the Act are properly before us. South Carolina has not challenged §§ 2, 3, 4 (e), 6 (a), 8, 10, 12 (d) and (e), 13 (b), and other miscellaneous provisions having nothing to do with this lawsuit. Judicial review of these sections must await subsequent litiga-

tion.[22]   In addition, we find that South Carolina's attack on §§ 11 and 12 (a)–(c) is premature.   No person has yet been subjected to, or even threatened with, the criminal sanctions which these sections of the Act authorize. See *United States* v. *Raines,* 362 U. S. 17, 20–24.   Consequently, the only sections of the Act to be reviewed at this time are §§ 4 (a)–(d), 5, 6 (b), 7, 9, 13 (a), and certain procedural portions of § 14, all of which are presently in actual operation in South Carolina.   We turn now to a detailed description of these provisions and their present status.

*Coverage formula.*

The remedial sections of the Act assailed by South Carolina automatically apply to any State, or to any separate political subdivision such as a county or parish, for which two findings have been made: (1) the Attorney General has determined that on November 1, 1964, it maintained a "test or device," and (2) the Director of the Census has determined that less than 50% of its voting-age residents were registered on November 1, 1964, or voted in the presidential election of November 1964. These findings are not reviewable in any court and are final upon publication in the Federal Register. § 4 (b). As used throughout the Act, the phrase "test or device" means any requirement that a registrant or voter must "(1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his quali-

[22] Section 4 (e) has been challenged in *Morgan* v. *Katzenbach,* 247 F. Supp. 196, prob. juris. noted, 382 U. S. 1007, and in *United States* v. *County Bd. of Elections,* 248 F. Supp. 316.   Section 10 (a)–(c) is involved in *United States* v. *Texas,* 252 F. Supp. 234, and in *United States* v. *Alabama,* 252 F. Supp. 95; see also *Harper* v. *Virginia State Bd. of Elections,* No. 48, 1965 Term, and *Butts* v. *Harrison,* No. 655, 1965 Term, which were argued together before this Court on January 25 and 26, 1966.

fications by the voucher of registered voters or members of any other class." § 4 (c).

Statutory coverage of a State or political subdivision under § 4 (b) is terminated if the area obtains a declaratory judgment from the District Court for the District of Columbia, determining that tests and devices have not been used during the preceding five years to abridge the franchise on racial grounds. The Attorney General shall consent to entry of the judgment if he has no reason to believe that the facts are otherwise. § 4 (a). For the purposes of this section, tests and devices are not deemed to have been used in a forbidden manner if the incidents of discrimination are few in number and have been promptly corrected, if their continuing effects have been abated, and if they are unlikely to recur in the future. § 4 (d). On the other hand, no area may obtain a declaratory judgment for five years after the final decision of a federal court (other than the denial of a judgment under this section of the Act), determining that discrimination through the use of tests or devices has occurred anywhere in the State or political subdivision. These declaratory judgment actions are to be heard by a three-judge panel, with direct appeal to this Court. § 4 (a).

South Carolina was brought within the coverage formula of the Act on August 7, 1965, pursuant to appropriate administrative determinations which have not been challenged in this proceeding.[23] On the same day, coverage was also extended to Alabama, Alaska, Georgia, Louisiana, Mississippi, Virginia, 26 counties in North Carolina, and one county in Arizona.[24] Two more counties in Arizona, one county in Hawaii, and one county in Idaho were added to the list on November 19, 1965.[25]

---

[23] 30 Fed. Reg. 9897.

[24] *Ibid.*

[25] 30 Fed. Reg. 14505.

Thus far Alaska, the three Arizona counties, and the single county in Idaho have asked the District Court for the District of Columbia to grant a declaratory judgment terminating statutory coverage.[26]

*Suspension of tests.*

In a State or political subdivision covered by § 4 (b) of the Act, no person may be denied the right to vote in any election because of his failure to comply with a "test or device." § 4 (a).

On account of this provision, South Carolina is temporarily barred from enforcing the portion of its voting laws which requires every applicant for registration to show that he:

> "Can both read and write any section of [the State] Constitution submitted to [him] by the registration officer or can show that he owns, and has paid all taxes collectible during the previous year on, property in this State assessed at three hundred dollars or more." S. C. Code Ann. § 23–62 (4) (1965 Supp.).

The Attorney General has determined that the property qualification is inseparable from the literacy test,[27] and South Carolina makes no objection to this finding. Similar tests and devices have been temporarily suspended in the other sections of the country listed above.[28]

*Review of new rules.*

In a State or political subdivision covered by § 4 (b) of the Act, no person may be denied the right to vote in any election because of his failure to comply with a voting qualification or procedure different from those in force on

---

[26] *Alaska v. United States,* Civ. Act. 101–66; *Apache County v. United States,* Civ. Act. 292–66; *Elmore County v. United States,* Civ. Act. 320–66.

[27] 30 Fed. Reg. 14045–14046.

[28] For a chart of the tests and devices in effect at the time the Act was under consideration, see House Hearings 30–32; Senate Report 42–43.

November 1, 1964. This suspension of new rules is terminated, however, under either of the following circumstances: (1) if the area has submitted the rules to the Attorney General, and he has not interposed an objection within 60 days, or (2) if the area has obtained a declaratory judgment from the District Court for the District of Columbia, determining that the rules will not abridge the franchise on racial grounds. These declaratory judgment actions are to be heard by a three-judge panel, with direct appeal to this Court. § 5.

South Carolina altered its voting laws in 1965 to extend the closing hour at polling places from 6 p. m. to 7 p. m.[29] The State has not sought judicial review of this change in the District Court for the District of Columbia, nor has it submitted the new rule to the Attorney General for his scrutiny, although at our hearing the Attorney General announced that he does not challenge the amendment. There are indications in the record that other sections of the country listed above have also altered their voting laws since November 1, 1964.[30]

*Federal examiners.*

In any political subdivision covered by § 4 (b) of the Act, the Civil Service Commission shall appoint voting examiners whenever the Attorney General certifies either of the following facts: (1) that he has received meritorious written complaints from at least 20 residents alleging that they have been disenfranchised under color of law because of their race, or (2) that the appointment of examiners is otherwise necessary to effectuate the guarantees of the Fifteenth Amendment. In making the latter determination, the Attorney General must consider, among other factors, whether the registration ratio of non-whites to whites seems reasonably attributable to

---

[29] S. C. Code Ann. § 23–342 (1965 Supp.).

[30] Brief for Mississippi as *amicus curiae,* App.

racial discrimination, or whether there is substantial evidence of good-faith efforts to comply with the Fifteenth Amendment. § 6 (b). These certifications are not reviewable in any court and are effective upon publication in the Federal Register. § 4 (b).

The examiners who have been appointed are to test the voting qualifications of applicants according to regulations of the Civil Service Commission prescribing times, places, procedures, and forms. §§ 7 (a) and 9 (b). Any person who meets the voting requirements of state law, insofar as these have not been suspended by the Act, must promptly be placed on a list of eligible voters. Examiners are to transmit their lists at least once a month to the appropriate state or local officials, who in turn are required to place the listed names on the official voting rolls. Any person listed by an examiner is entitled to vote in all elections held more than 45 days after his name has been transmitted. § 7 (b).

A person shall be removed from the voting list by an examiner if he has lost his eligibility under valid state law, or if he has been successfully challenged through the procedure prescribed in § 9 (a) of the Act. § 7 (d). The challenge must be filed at the office within the State designated by the Civil Service Commission; must be submitted within 10 days after the listing is made available for public inspection; must be supported by the affidavits of at least two people having personal knowledge of the relevant facts; and must be served on the person challenged by mail or at his residence. A hearing officer appointed by the Civil Service Commission shall hear the challenge and render a decision within 15 days after the challenge is filed. A petition for review of the hearing officer's decision must be submitted within an additional 15 days after service of the decision on the person seeking review. The court of appeals for the circuit in which the person challenged resides is to

hear the petition and affirm the hearing officer's decision unless it is clearly erroneous. Any person listed by an examiner is entitled to vote pending a final decision of the hearing officer or the court. § 9 (a).

The listing procedures in a political subdivision are terminated under either of the following circumstances: (1) if the Attorney General informs the Civil Service Commission that all persons listed by examiners have been placed on the official voting rolls, and that there is no longer reasonable cause to fear abridgment of the franchise on racial grounds, or (2) if the political subdivision has obtained a declaratory judgment from the District Court for the District of Columbia, ascertaining the same facts which govern termination by the Attorney General, and the Director of the Census has determined that more than 50% of the non-white residents of voting age are registered to vote. A political subdivision may petition the Attorney General to terminate listing procedures or to authorize the necessary census, and the District Court itself shall request the census if the Attorney General's refusal to do so is arbitrary or unreasonable. § 13 (a). The determinations by the Director of the Census are not reviewable in any court and are final upon publication in the Federal Register. § 4 (b).

On October 30, 1965, the Attorney General certified the need for federal examiners in two South Carolina counties,[31] and examiners appointed by the Civil Service Commission have been serving there since November 8, 1965. Examiners have also been assigned to 11 counties in Alabama, five parishes in Louisiana, and 19 counties in Mississippi.[32] The examiners are listing people found eligible to vote, and the challenge procedure has been

---

[31] 30 Fed. Reg. 13850.

[32] 30 Fed. Reg. 9970–9971, 10863, 12363, 12654, 13849–13850, 15837; 31 Fed. Reg. 914.

employed extensively.[33]    No political subdivision has yet sought to have federal examiners withdrawn through the Attorney General or the District Court for the District of Columbia.

### III.

These provisions of the Voting Rights Act of 1965 are challenged on the fundamental ground that they exceed the powers of Congress and encroach on an area reserved to the States by the Constitution.    South Carolina and certain of the *amici curiae* also attack specific sections of the Act for more particular reasons.    They argue that the coverage formula prescribed in § 4 (a)–(d) violates the principle of the equality of States, denies due process by employing an invalid presumption and by barring judicial review of administrative findings, constitutes a forbidden bill of attainder, and impairs the separation of powers by adjudicating guilt through legislation.    They claim that the review of new voting rules required in § 5 infringes Article III by directing the District Court to issue advisory opinions.    They contend that the assignment of federal examiners authorized in § 6 (b) abridges due process by precluding judicial review of administrative findings and impairs the separation of powers by giving the Attorney General judicial functions; also that the challenge procedure prescribed in § 9 denies due process on account of its speed.    Finally, South Carolina and certain of the *amici curiae* maintain that §§ 4 (a) and 5, buttressed by § 14 (b) of the Act, abridge due process by limiting litigation to a distant forum.

Some of these contentions may be dismissed at the outset.    The word "person" in the context of the Due Process Clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union, and to our knowledge

---

[33] See Comm'n on Civil Rights, The Voting Rights Act (1965).

this has never been done by any court. See *International Shoe Co.* v. *Cocreham,* 246 La. 244, 266, 164 So. 2d 314, 322, n. 5; cf. *United States* v. *City of Jackson,* 318 F. 2d 1, 8 (C. A. 5th Cir.). Likewise, courts have consistently regarded the Bill of Attainder Clause of Article I and the principle of the separation of powers only as protections for individual persons and private groups, those who are peculiarly vulnerable to nonjudicial determinations of guilt. See *United States* v. *Brown,* 381 U. S. 437; *Ex parte Garland,* 4 Wall. 333. Nor does a State have standing as the parent of its citizens to invoke these constitutional provisions against the Federal Government, the ultimate *parens patriae* of every American citizen. *Massachusetts* v. *Mellon,* 262 U. S. 447, 485–486; *Florida* v. *Mellon,* 273 U. S. 12, 18. The objections to the Act which are raised under these provisions may therefore be considered only as additional aspects of the basic question presented by the case: Has Congress exercised its powers under the Fifteenth Amendment in an appropriate manner with relation to the States?

The ground rules for resolving this question are clear. The language and purpose of the Fifteenth Amendment, the prior decisions construing its several provisions, and the general doctrines of constitutional interpretation, all point to one fundamental principle. As against the reserved powers of the States, Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting. Cf. our rulings last Term, sustaining Title II of the Civil Rights Act of 1964, in *Heart of Atlanta Motel* v. *United States,* 379 U. S. 241, 258–259, 261–262; and *Katzenbach* v. *McClung,* 379 U. S. 294, 303–304. We turn now to a more detailed description of the standards which govern our review of the Act.

Section 1 of the Fifteenth Amendment declares that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." This declaration has always been treated as self-executing and has repeatedly been construed, without further legislative specification, to invalidate state voting qualifications or procedures which are discriminatory on their face or in practice. See *Neal* v. *Delaware,* 103 U. S. 370; *Guinn* v. *United States,* 238 U. S. 347; *Myers* v. *Anderson,* 238 U. S. 368; *Lane* v. *Wilson,* 307 U. S. 268; *Smith* v. *Allwright,* 321 U. S. 649; *Schnell* v. *Davis,* 336 U. S. 933; *Terry* v. *Adams,* 345 U. S. 461; *United States* v. *Thomas,* 362 U. S. 58; *Gomillion* v. *Lightfoot,* 364 U. S. 339; *Alabama* v. *United States,* 371 U. S. 37; *Louisiana* v. *United States,* 380 U. S. 145. These decisions have been rendered with full respect for the general rule, reiterated last Term in *Carrington* v. *Rash,* 380 U. S. 89, 91, that States "have broad powers to determine the conditions under which the right of suffrage may be exercised." The gist of the matter is that the Fifteenth Amendment supersedes contrary exertions of state power. "When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right." *Gomillion* v. *Lightfoot,* 364 U. S., at 347.

South Carolina contends that the cases cited above are precedents only for the authority of the judiciary to strike down state statutes and procedures—that to allow an exercise of this authority by Congress would be to rob the courts of their rightful constitutional role. On the contrary, § 2 of the Fifteenth Amendment expressly declares that "Congress shall have power to enforce this article by appropriate legislation." By adding this

authorization, the Framers indicated that Congress was to be chiefly responsible for implementing the rights created in § 1. "It is the power of Congress which has been enlarged. Congress is authorized to *enforce* the prohibitions by appropriate legislation. Some legislation is contemplated to make the [Civil War] amendments fully effective." *Ex parte Virginia,* 100 U. S. 339, 345. Accordingly, in addition to the courts, Congress has full remedial powers to effectuate the constitutional prohibition against racial discrimination in voting.

Congress has repeatedly exercised these powers in the past, and its enactments have repeatedly been upheld. For recent examples, see the Civil Rights Act of 1957, which was sustained in *United States* v. *Raines,* 362 U. S. 17; *United States* v. *Thomas, supra;* and *Hannah* v. *Larche,* 363 U. S. 420; and the Civil Rights Act of 1960, which was upheld in *Alabama* v. *United States, supra; Louisiana* v. *United States, supra;* and *United States* v. *Mississippi,* 380 U. S. 128. On the rare occasions when the Court has found an unconstitutional exercise of these powers, in its opinion Congress had attacked evils not comprehended by the Fifteenth Amendment. See *United States* v. *Reese,* 92 U. S. 214; *James* v. *Bowman,* 190 U. S. 127.

The basic test to be applied in a case involving § 2 of the Fifteenth Amendment is the same as in all cases concerning the express powers of Congress with relation to the reserved powers of the States. Chief Justice Marshall laid down the classic formulation, 50 years before the Fifteenth Amendment was ratified:

> "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *McCulloch* v. *Maryland,* 4 Wheat. 316, 421.

The Court has subsequently echoed his language in describing each of the Civil War Amendments:

> "Whatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power." *Ex parte Virginia,* 100 U. S., at 345–346.

This language was again employed, nearly 50 years later, with reference to Congress' related authority under § 2 of the Eighteenth Amendment. *James Everard's Breweries* v. *Day,* 265 U. S. 545, 558–559.

We therefore reject South Carolina's argument that Congress may appropriately do no more than to forbid violations of the Fifteenth Amendment in general terms—that the task of fashioning specific remedies or of applying them to particular localities must necessarily be left entirely to the courts. Congress is not circumscribed by any such artificial rules under § 2 of the Fifteenth Amendment. In the oft-repeated words of Chief Justice Marshall, referring to another specific legislative authorization in the Constitution, "This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." *Gibbons* v. *Ogden,* 9 Wheat. 1, 196.

## IV.

Congress exercised its authority under the Fifteenth Amendment in an inventive manner when it enacted the Voting Rights Act of 1965. First: The measure prescribes remedies for voting discrimination which go into

effect without any need for prior adjudication. This was clearly a legitimate response to the problem, for which there is ample precedent under other constitutional provisions. See *Katzenbach* v. *McClung*, 379 U. S. 294, 302–304; *United States* v. *Darby*, 312 U. S. 100, 120–121. Congress had found that case-by-case litigation was inadequate to combat widespread and persistent discrimination in voting, because of the inordinate amount of time and energy required to overcome the obstructionist tactics invariably encountered in these lawsuits.[34]  After enduring nearly a century of systematic resistance to the Fifteenth Amendment, Congress might well decide to shift the advantage of time and inertia from the perpetrators of the evil to its victims. The question remains, of course, whether the specific remedies prescribed in the Act were an appropriate means of combatting the evil, and to this question we shall presently address ourselves.

Second: The Act intentionally confines these remedies to a small number of States and political subdivisions which in most instances were familiar to Congress by name.[35]  This, too, was a permissible method of dealing with the problem. Congress had learned that substantial voting discrimination presently occurs in certain sections of the country, and it knew no way of accurately forecasting whether the evil might spread elsewhere in the future.[36]  In acceptable legislative fashion, Congress chose to limit its attention to the geographic areas where immediate action seemed necessary. See *McGowan* v. *Maryland*, 366 U. S. 420, 427; *Salsburg* v. *Maryland*, 346 U. S. 545, 550–554. The doctrine of the equality of States, invoked by South Carolina, does not bar this approach, for that doctrine applies only to the terms

---

[34] House Report 9–11; Senate Report 6–9.

[35] House Report 13; Senate Report 52, 55.

[36] House Hearings 27; Senate Hearings 201.

upon which States are admitted to the Union, and not
to the remedies for local evils which have subsequently
appeared. See *Coyle* v. *Smith*, 221 U. S. 559, and cases
cited therein.

*Coverage formula.*

We now consider the related question of whether the
specific States and political subdivisions within § 4 (b) of
the Act were an appropriate target for the new remedies.
South Carolina contends that the coverage formula is
awkwardly designed in a number of respects and that it
disregards various local conditions which have nothing
to do with racial discrimination. These arguments, how-
ever, are largely beside the point.[37] Congress began
work with reliable evidence of actual voting discrimina-
tion in a great majority of the States and political sub-
divisions affected by the new remedies of the Act. The
formula eventually evolved to describe these areas was
relevant to the problem of voting discrimination, and
Congress was therefore entitled to infer a significant
danger of the evil in the few remaining States and polit-
ical subdivisions covered by § 4 (b) of the Act. No more
was required to justify the application to these areas of
Congress' express powers under the Fifteenth Amend-
ment. Cf. *North American Co.* v. *S. E. C.*, 327 U. S. 686,
710–711; *Assigned Car Cases*, 274 U. S. 564, 582–583.

To be specific, the new remedies of the Act are imposed
on three States—Alabama, Louisiana, and Mississippi—
in which federal courts have repeatedly found substantial
voting discrimination.[38] Section 4 (b) of the Act also
embraces two other States—Georgia and South Caro-
lina—plus large portions of a third State—North Caro-
lina—for which there was more fragmentary evidence of

---

[37] For Congress' defense of the formula, see House Report 13–14;
Senate Report 13–14.

[38] House Report 12; Senate Report 9–10.

recent voting discrimination mainly adduced by the Justice Department and the Civil Rights Commission.[39] All of these areas were appropriately subjected to the new remedies. In identifying past evils, Congress obviously may avail itself of information from any probative source. See *Heart of Atlanta Motel* v. *United States,* 379 U. S. 241, 252–253; *Katzenbach* v. *McClung,* 379 U. S., at 299–301.

The areas listed above, for which there was evidence of actual voting discrimination, share two characteristics incorporated by Congress into the coverage formula: the use of tests and devices for voter registration, and a voting rate in the 1964 presidential election at least 12 points below the national average. Tests and devices are relevant to voting discrimination because of their long history as a tool for perpetrating the evil; a low voting rate is pertinent for the obvious reason that widespread disenfranchisement must inevitably affect the number of actual voters. Accordingly, the coverage formula is rational in both practice and theory. It was therefore permissible to impose the new remedies on the few remaining States and political subdivisions covered by the formula, at least in the absence of proof that they have been free of substantial voting discrimination in recent years. Congress is clearly not bound by the rules relating to statutory presumptions in criminal cases when it prescribes civil remedies against other organs of government under § 2 of the Fifteenth Amendment. Compare *United States* v. *Romano,* 382 U. S. 136; *Tot* v. *United States,* 319 U. S. 463.

It is irrelevant that the coverage formula excludes certain localities which do not employ voting tests and

---

[39] Georgia: House Hearings 160–176; Senate Hearings 1182–1184, 1237, 1253, 1300–1301, 1336–1345. North Carolina: Senate Hearings 27–28, 39, 246–248. South Carolina: House Hearings 114–116, 196–201; Senate Hearings 1353–1354.

devices but for which there is evidence of voting discrimination by other means. Congress had learned that widespread and persistent discrimination in voting during recent years has typically entailed the misuse of tests and devices, and this was the evil for which the new remedies were specifically designed.[40] At the same time, through §§ 3, 6 (a), and 13 (b) of the Act, Congress strengthened existing remedies for voting discrimination in other areas of the country. Legislation need not deal with all phases of a problem in the same way, so long as the distinctions drawn have some basis in practical experience. See *Williamson* v. *Lee Optical Co.*, 348 U. S. 483, 488–489; *Railway Express Agency* v. *New York*, 336 U. S. 106. There are no States or political subdivisions exempted from coverage under § 4 (b) in which the record reveals recent racial discrimination involving tests and devices. This fact confirms the rationality of the formula.

Acknowledging the possibility of overbreadth, the Act provides for termination of special statutory coverage at the behest of States and political subdivisions in which the danger of substantial voting discrimination has not materialized during the preceding five years. Despite South Carolina's argument to the contrary, Congress might appropriately limit litigation under this provision to a single court in the District of Columbia, pursuant to its constitutional power under Art. III, § 1, to "ordain and establish" inferior federal tribunals. See *Bowles* v. *Willingham*, 321 U. S. 503, 510–512; *Yakus* v. *United States*, 321 U. S. 414, 427–431; *Lockerty* v. *Phillips*, 319 U. S. 182. At the present time, contractual claims against the United States for more than $10,000 must be brought in the Court of Claims, and, until 1962, the District of Columbia was the sole venue of suits against

---

[40] House Hearings 75–77; Senate Hearings 241–243.

federal officers officially residing in the Nation's Capital.[41] We have discovered no suggestion that Congress exceeded constitutional bounds in imposing these limitations on litigation against the Federal Government, and the Act is no less reasonable in this respect.

South Carolina contends that these termination procedures are a nullity because they impose an impossible burden of proof upon States and political subdivisions entitled to relief. As the Attorney General pointed out during hearings on the Act, however, an area need do no more than submit affidavits from voting officials, asserting that they have not been guilty of racial discrimination through the use of tests and devices during the past five years, and then refute whatever evidence to the contrary may be adduced by the Federal Government.[42] Section 4 (d) further assures that an area need not disprove each isolated instance of voting discrimination in order to obtain relief in the termination proceedings. The burden of proof is therefore quite bearable, particularly since the relevant facts relating to the conduct of voting officials are peculiarly within the knowledge of the States and political subdivisions themselves. See *United States* v. *New York, N. H. & H. R. Co.,* 355 U. S. 253, 256, n. 5; cf. *S. E. C.* v. *Ralston Purina Co.,* 346 U. S. 119, 126.

The Act bars direct judicial review of the findings by the Attorney General and the Director of the Census which trigger application of the coverage formula. We reject the claim by Alabama as *amicus curiae* that this provision is invalid because it allows the new remedies of

---

[41] Regarding claims against the United States, see 28 U. S. C. §§ 1491, 1346 (a) (1964 ed.). Concerning suits against federal officers, see *Stroud* v. *Benson,* 254 F. 2d 448; H. R. Rep. No. 536, 87th Cong., 1st Sess.; S. Rep. No. 1992, 87th Cong., 2d Sess.; 28 U. S. C. § 1391 (e) (1964 ed.); 2 Moore, Federal Practice ¶ 4.29 (1964 ed.).

[42] House Hearings 92–93; Senate Hearings 26–27.

the Act to be imposed in an arbitrary way. The Court has already permitted Congress to withdraw judicial review of administrative determinations in numerous cases involving the statutory rights of private parties. For example, see *United States* v. *California Eastern Line,* 348 U. S. 351; *Switchmen's Union* v. *National Mediation Bd.,* 320 U. S. 297. In this instance, the findings not subject to review consist of objective statistical determinations by the Census Bureau and a routine analysis of state statutes by the Justice Department. These functions are unlikely to arouse any plausible dispute, as South Carolina apparently concedes. In the event that the formula is improperly applied, the area affected can always go into court and obtain termination of coverage under § 4 (b), provided of course that it has not been guilty of voting discrimination in recent years. This procedure serves as a partial substitute for direct judicial review.

*Suspension of tests.*

We now arrive at consideration of the specific remedies prescribed by the Act for areas included within the coverage formula. South Carolina assails the temporary suspension of existing voting qualifications, reciting the rule laid down by *Lassiter* v. *Northampton County Bd. of Elections,* 360 U. S. 45, that literacy tests and related devices are not in themselves contrary to the Fifteenth Amendment. In that very case, however, the Court went on to say, "Of course a literacy test, fair on its face, may be employed to perpetuate that discrimination which the Fifteenth Amendment was designed to uproot." *Id.,* at 53. The record shows that in most of the States covered by the Act, including South Carolina, various tests and devices have been instituted with the purpose of disenfranchising Negroes, have been framed in such a way as to facilitate this aim, and have been ad-

ministered in a discriminatory fashion for many years.[43] Under these circumstances, the Fifteenth Amendment has clearly been violated. See *Louisiana* v. *United States,* 380 U. S. 145; *Alabama* v. *United States,* 371 U. S. 37; *Schnell* v. *Davis,* 336 U. S. 933.

The Act suspends literacy tests and similar devices for a period of five years from the last occurrence of substantial voting discrimination. This was a legitimate response to the problem, for which there is ample precedent in Fifteenth Amendment cases. *Ibid.* Underlying the response was the feeling that States and political subdivisions which had been allowing white illiterates to vote for years could not sincerely complain about "dilution" of their electorates through the registration of Negro illiterates.[44] Congress knew that continuance of the tests and devices in use at the present time, no matter how fairly administered in the future, would freeze the effect of past discrimination in favor of unqualified white registrants.[45] Congress permissibly rejected the alternative of requiring a complete re-registration of all voters, believing that this would be too harsh on many whites who had enjoyed the franchise for their entire adult lives.[46]

*Review of new rules.*

The Act suspends new voting regulations pending scrutiny by federal authorities to determine whether their use would violate the Fifteenth Amendment. This may have been an uncommon exercise of congressional power, as South Carolina contends, but the Court has recognized that exceptional conditions can justify legislative measures not otherwise appropriate. See *Home*

---

[43] House Report 11–13; Senate Report 4–5, 9–12.

[44] House Report 15; Senate Report 15–16.

[45] House Report 15; Senate Report 16.

[46] House Hearings 17; Senate Hearings 22–23.

*Bldg. & Loan Assn.* v. *Blaisdell,* 290 U. S. 398; *Wilson* v. *New,* 243 U. S. 332. Congress knew that some of the States covered by § 4 (b) of the Act had resorted to the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees.[47] Congress had reason to suppose that these States might try similar maneuvers in the future in order to evade the remedies for voting discrimination contained in the Act itself. Under the compulsion of these unique circumstances, Congress responded in a permissibly decisive manner.

For reasons already stated, there was nothing inappropriate about limiting litigation under this provision to the District Court for the District of Columbia, and in putting the burden of proof on the areas seeking relief. Nor has Congress authorized the District Court to issue advisory opinions, in violation of the principles of Article III invoked by Georgia as *amicus curiae.* The Act automatically suspends the operation of voting regulations enacted after November 1, 1964, and furnishes mechanisms for enforcing the suspension. A State or political subdivision wishing to make use of a recent amendment to its voting laws therefore has a concrete and immediate "controversy" with the Federal Government. Cf. *Public Utilities Comm'n* v. *United States,* 355 U. S. 534, 536–539; *United States* v. *California,* 332 U. S. 19, 24–25. An appropriate remedy is a judicial determination that continued suspension of the new rule is unnecessary to vindicate rights guaranteed by the Fifteenth Amendment.

*Federal examiners.*

The Act authorizes the appointment of federal examiners to list qualified applicants who are thereafter

---

[47] House Report 10–11; Senate Report 8, 12.

entitled to vote, subject to an expeditious challenge procedure. This was clearly an appropriate response to the problem, closely related to remedies authorized in prior cases. See *Alabama* v. *United States, supra; United States* v. *Thomas,* 362 U. S. 58. In many of the political subdivisions covered by § 4 (b) of the Act, voting officials have persistently employed a variety of procedural tactics to deny Negroes the franchise, often in direct defiance or evasion of federal court decrees.[48] Congress realized that merely to suspend voting rules which have been misused or are subject to misuse might leave this localized evil undisturbed. As for the briskness of the challenge procedure, Congress knew that in some of the areas affected, challenges had been persistently employed to harass registered Negroes. It chose to forestall this abuse, at the same time providing alternative ways for removing persons listed through error or fraud.[49] In addition to the judicial challenge procedure, § 7 (d) allows for the removal of names by the examiner himself, and § 11 (c) makes it a crime to obtain a listing through fraud.

In recognition of the fact that there were political subdivisions covered by § 4.(b) of the Act in which the appointment of federal examiners might be unnecessary, Congress assigned the Attorney General the task of determining the localities to which examiners should be sent.[50] There is no warrant for the claim, asserted by Georgia as *amicus curiae,* that the Attorney General is free to use this power in an arbitrary fashion, without regard to the purposes of the Act. Section 6 (b) sets adequate standards to guide the exercise of his discretion, by directing him to calculate the registration ratio of nonwhites to whites, and to weigh evidence of good-faith

[48] House Report 16; Senate Report 15.
[49] Senate Hearings 200.
[50] House Report 16.

efforts to avoid possible voting discrimination. At the same time, the special termination procedures of § 13 (a) provide indirect judicial review for the political subdivisions affected, assuring the withdrawal of federal examiners from areas where they are clearly not needed. Cf. *Carlson* v. *Landon*, 342 U. S. 524, 542–544; *Mulford* v. *Smith*, 307 U. S. 38, 48–49.

After enduring nearly a century of widespread resistance to the Fifteenth Amendment, Congress has marshalled an array of potent weapons against the evil, with authority in the Attorney General to employ them effectively. Many of the areas directly affected by this development have indicated their willingness to abide by any restraints legitimately imposed upon them.[51] We here hold that the portions of the Voting Rights Act properly before us are a valid means for carrying out the commands of the Fifteeenth Amendment. Hopefully, millions of non-white Americans will now be able to participate for the first time on an equal basis in the government under which they live. We may finally look forward to the day when truly "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

The bill of complaint is                    *Dismissed.*

## APPENDIX TO OPINION OF THE COURT.

### VOTING RIGHTS ACT OF 1965.

#### AN ACT

To enforce the fifteenth amendment to the Constitution of the United States, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress*

---

[51] See Comm'n on Civil Rights, The Voting Rights Act (1965).

*assembled,* That this Act shall be known as the "Voting Rights Act of 1965."

SEC. 2. No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color.

SEC. 3. (a) Whenever the Attorney General institutes a proceeding under any statute to enforce the guarantees of the fifteenth amendment in any State or political subdivision the court shall authorize the appointment of Federal examiners by the United States Civil Service Commission in accordance with section 6 to serve for such period of time and for such political subdivisions as the court shall determine is appropriate to enforce the guarantees of the fifteenth amendment (1) as part of any interlocutory order if the court determines that the appointment of such examiners is necessary to enforce such guarantees or (2) as part of any final judgment if the court finds that violations of the fifteenth amendment justifying equitable relief have occurred in such State or subdivision: *Provided,* That the court need not authorize the appointment of examiners if any incidents of denial or abridgement of the right to vote on account of race or color (1) have been few in number and have been promptly and effectively corrected by State or local action, (2) the continuing effect of such incidents has been eliminated, and (3) there is no reasonable probability of their recurrence in the future.

(b) If in a proceeding instituted by the Attorney General under any statute to enforce the guarantees of the fifteenth amendment in any State or political subdivision the court finds that a test or device has been used for the purpose or with the effect of denying or abridging the right of any citizen of the United States to vote on account of race or color, it shall suspend the use of

tests and devices in such State or political subdivisions as the court shall determine is appropriate and for such period as it deems necessary.

(c) If in any proceeding instituted by the Attorney General under any statute to enforce the guarantees of the fifteenth amendment in any State or political subdivision the court finds that violations of the fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision, the court, in addition to such relief as it may grant, shall retain jurisdiction for such period as it may deem appropriate and during such period no voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect at the time the proceeding was commenced shall be enforced unless and until the court finds that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color: *Provided*, That such qualification, prerequisite, standard, practice, or procedure may be enforced if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the court's finding nor the Attorney General's failure to object shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure.

SEC. 4. (a) To assure that the right of citizens of the United States to vote is not denied or abridged on account of race or color, no citizen shall be denied the right to vote in any Federal, State, or local election because of his failure to comply with any test or device in any State with respect to which the determinations have been

made under subsection (b) or in any political subdivision with respect to which such determinations have been made as a separate unit, unless the United States District Court for the District of Columbia in an action for a declaratory judgment brought by such State or subdivision against the United States has determined that no such test or device has been used during the five years preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color: *Provided,* That no such declaratory judgment shall issue with respect to any plaintiff for a period of five years after the entry of a final judgment of any court of the United States, other than the denial of a declaratory judgment under this section, whether entered prior to or after the enactment of this Act, determining that denials or abridgments of the right to vote on account of race or color through the use of such tests or devices have occurred anywhere in the territory of such plaintiff.

An action pursuant to this subsection shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28 of the United States Code and any appeal shall lie to the Supreme Court. The court shall retain jurisdiction of any action pursuant to this subsection for five years after judgment and shall reopen the action upon motion of the Attorney General alleging that a test or device has been used for the purpose or with the effect of denying or abridging the right to vote on account of race or color.

If the Attorney General determines that he has no reason to believe that any such test or device has been used during the five years preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color, he shall consent to the entry of such judgment.

(b) The provisions of subsection (a) shall apply in any State or in any political subdivision of a state which (1) the Attorney General determines maintained on November 1, 1964, any test or device, and with respect to which (2) the Director of the Census determines that less than 50 per centum of the persons of voting age residing therein were registered on November 1, 1964, or that less than 50 per centum of such persons voted in the presidential election of November 1964.

A determination or certification of the Attorney General or of the Director of the Census under this section or under section 6 or section 13 shall not be reviewable in any court and shall be effective upon publication in the Federal Register.

(c) The phrase "test or device" shall mean any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class.

(d) For purposes of this section no State or political subdivision shall be determined to have engaged in the use of tests or devices for the purpose or with the effect of denying or abridging the right to vote on account of race or color if (1) incidents of such use have been few in number and have been promptly and effectively corrected by State or local action, (2) the continuing effect of such incidents has been eliminated, and (3) there is no reasonable probability of their recurrence in the future.

(e)(1) Congress hereby declares that to secure the rights under the fourteenth amendment of persons educated in American-flag schools in which the predominant

classroom language was other than English, it is necessary to prohibit the States from conditioning the right to vote of such persons on ability to read, write, understand, or interpret any matter in the English language.

(2) No person who demonstrates that he has successfully completed the sixth primary grade in a public school in, or a private school accredited by, any State or territory, the District of Columbia, or the Commonwealth of Puerto Rico in which the predominant classroom language was other than English, shall be denied the right to vote in any Federal, State, or local election because of his inability to read, write, understand, or interpret any matter in the English language, except that in States in which State law provides that a different level of education is presumptive of literacy, he shall demonstrate that he has successfully completed an equivalent level of education in a public school in, or a private school accredited by, any State or territory, the District of Columbia, or the Commonwealth of Puerto Rico in which the predominant classroom language was other than English.

SEC. 5. Whenever a State or political subdivision with respect to which the prohibitions set forth in section 4 (a) are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, prac-

tice, or procedure: *Provided,* That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the Attorney General's failure to object nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure.   Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28 of the United States Code and any appeal shall lie to the Supreme Court.

SEC. 6. Whenever (a) a court has authorized the appointment of examiners pursuant to the provisions of section 3 (a), or (b) unless a declaratory judgment has been rendered under section 4 (a), the Attorney General certifies with respect to any political subdivision named in, or included within the scope of, determinations made under section 4 (b) that (1) he has received complaints in writing from twenty or more residents of such political subdivision alleging that they have been denied the right to vote under color of law on account of race or color, and that he believes such complaints to be meritorious, or (2) that in his judgment (considering, among other factors, whether the ratio of nonwhite persons to white persons registered to vote within such subdivision appears to him to be reasonably attributable to violations of the fifteenth amendment or whether substantial evidence exists that bona fide efforts are being made within such subdivision to comply with the fifteenth amendment), the appointment of examiners is otherwise necessary to

enforce the guarantees of the fifteenth amendment, the Civil Service Commission shall appoint as many examiners for such subdivision as it may deem appropriate to prepare and maintain lists of persons eligible to vote in Federal, State, and local elections. Such examiners, hearing officers provided for in section 9 (a), and other persons deemed necessary by the Commission to carry out the provisions and purposes of this Act shall be appointed, compensated, and separated without regard to the provisions of any statute administered by the Civil Service Commission, and service under this Act shall not be considered employment for the purposes of any statute administered by the Civil Service Commission, except the provisions of section 9 of the Act of August 2, 1939, as amended (5 U. S. C. 118i), prohibiting partisan political activity: *Provided,* That the Commission is authorized, after consulting the head of the appropriate department or agency, to designate suitable persons in the official service of the United States, with their consent, to serve in these positions. Examiners and hearing officers shall have the power to administer oaths.

SEC. 7. (a) The examiners for each political subdivision shall, at such places as the Civil Service Commission shall by regulation designate, examine applicants concerning their qualifications for voting. An application to an examiner shall be in such form as the Commission may require and shall contain allegations that the applicant is not otherwise registered to vote.

(b) Any person whom the examiner finds, in accordance with instructions received under section 9 (b), to have the qualifications prescribed by State law not inconsistent with the Constitution and laws of the United States shall promptly be placed on a list of eligible voters. A challenge to such listing may be made in accordance with section 9 (a) and shall not be the basis for a prosecution under section 12 of this Act. The ex-

aminer shall certify and transmit such list, and any supplements as appropriate, at least once a month, to the offices of the appropriate election officials, with copies to the Attorney General and the attorney general of the State, and any such lists and supplements thereto transmitted during the month shall be available for public inspection on the last business day of the month and in any event not later than the forty-fifth day prior to any election. The appropriate State or local election official shall place such names on the official voting list. Any person whose name appears on the examiner's list shall be entitled and allowed to vote in the election district of his residence unless and until the appropriate election officials shall have been notified that such person has been removed from such list in accordance with subsection (d): *Provided,* That no person shall be entitled to vote in any election by virtue of this Act unless his name shall have been certified and transmitted on such a list to the offices of the appropriate election officials at least forty-five days prior to such election.

(c) The examiner shall issue to each person whose name appears on such a list a certificate evidencing his eligibility to vote.

(d) A person whose name appears on such a list shall be removed therefrom by an examiner if (1) such person has been successfully challenged in accordance with the procedure prescribed in section 9, or (2) he has been determined by an examiner to have lost his eligibility to vote under State law not inconsistent with the Constitution and the laws of the United States.

Sec. 8. Whenever an examiner is serving under this Act in any political subdivision, the Civil Service Commission may assign, at the request of the Attorney General, one or more persons, who may be officers of the United States, (1) to enter and attend at any place for holding an election in such subdivision for the purpose

of observing whether persons who are entitled to vote are being permitted to vote, and (2) to enter and attend at any place for tabulating the votes cast at any election held in such subdivision for the purpose of observing whether votes cast by persons entitled to vote are being properly tabulated. Such persons so assigned shall report to an examiner appointed for such political subdivision, to the Attorney General, and if the appointment of examiners has been authorized pursuant to section 3 (a), to the court.

SEC. 9. (a) Any challenge to a listing on an eligibility list prepared by an examiner shall be heard and determined by a hearing officer appointed by and responsible to the Civil Service Commission and under such rules as the Commission shall by regulation prescribe. Such challenge shall be entertained only if filed at such office within the State as the Civil Service Commission shall by regulation designate, and within ten days after the listing of the challenged person is made available for public inspection, and if supported by (1) the affidavits of at least two persons having personal knowledge of the facts constituting grounds for the challenge, and (2) a certification that a copy of the challenge and affidavits have been served by mail or in person upon the person challenged at his place of residence set out in the application. Such challenge shall be determined within fifteen days after it has been filed. A petition for review of the decision of the hearing officer may be filed in the United States court of appeals for the circuit in which the person challenged resides within fifteen days after service of such decision by mail on the person petitioning for review but no decision of a hearing officer shall be reversed unless clearly erroneous. Any person listed shall be entitled and allowed to vote pending final determination by the hearing officer and by the court.

(b) The times, places, procedures, and form for application and listing pursuant to this Act and removals from the eligibility lists shall be prescribed by regulations promulgated by the Civil Service Commission and the Commision shall, after consultation with the Attorney General, instruct examiners concerning applicable State law not inconsistent with the Constitution and laws of the United States with respect to (1) the qualifications required for listing, and (2) loss of eligibility to vote.

(c) Upon the request of the applicant or the challenger or on its own motion the Civil Service Commission shall have the power to require by subpena the attendance and testimony of witnesses and the production of documentary evidence relating to any matter pending before it under the authority of this section. In case of contumacy or refusal to obey a subpena, any district court of the United States or the United States court of any territory or possession, or the District Court of the United States for the District of Columbia, within the jurisdiction of which said person guilty of contumacy or refusal to obey is found or resides or is domiciled or transacts business, or has appointed an agent for receipt of service of process, upon application by the Attorney General of the United States shall have jurisdiction to issue to such person an order requiring such person to appear before the Commission or a hearing officer, there to produce pertinent, relevant, and nonprivileged documentary evidence if so ordered, or there to give testimony touching the matter under investigation; and any failure to obey such order of the court may be punished by said court as a contempt thereof.

Sec. 10. (a) The Congress finds that the requirement of the payment of a poll tax as a precondition to voting (i) precludes persons of limited means from voting or imposes unreasonable financial hardship upon such per-

sons as a precondition to their exercise of the franchise, (ii) does not bear a reasonable relationship to any legitimate State interest in the conduct of elections, and (iii) in some areas has the purpose or effect of denying persons the right to vote because of race or color. Upon the basis of these findings, Congress declares that the constitutional right of citizens to vote is denied or abridged in some areas by the requirement of the payment of a poll tax as a precondition to voting.

(b) In the exercise of the powers of Congress under section 5 of the fourteenth amendment and section 2 of the fifteenth amendment, the Attorney General is authorized and directed to institute forthwith in the name of the United States such actions, including actions against States or political subdivisions, for declaratory judgment or injunctive relief against the enforcement of any requirement of the payment of a poll tax as a precondition to voting, or substitute therefor enacted after November 1, 1964, as will be necessary to implement the declaration of subsection (a) and the purposes of this section.

(c) The district courts of the United States shall have jurisdiction of such actions which shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28 of the United States Code and any appeal shall lie to the Supreme Court. It shall be the duty of the judges designated to hear the case to assign the case for hearing at the earliest practicable date, to participate in the hearing and determination thereof, and to cause the case to be in every way expedited.

(d) During the pendency of such actions, and thereafter if the courts, notwithstanding this action by the Congress, should declare the requirement of the payment of a poll tax to be constitutional, no citizen of the United States who is a resident of a State or political

subdivision with respect to which determinations have been made under subsection 4 (b) and a declaratory judgment has not been entered under subsection 4 (a), during the first year he becomes otherwise entitled to vote by reason of registration by State or local officials or listing by an examiner, shall be denied the right to vote for failure to pay a poll tax if he tenders payment of such tax for the current year to an examiner or to the appropriate State or local official at least forty-five days prior to election, whether or not such tender would be timely or adequate under State law. An examiner shall have authority to accept such payment from any person authorized by this Act to make an application for listing, and shall issue a receipt for such payment. The examiner shall transmit promptly any such poll tax payment to the office of the State or local official authorized to receive such payment under State law, together with the name and address of the applicant.

SEC. 11. (a) No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of this Act or is otherwise qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote.

(b) No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under section 3 (a), 6, 8, 9, 10, or 12 (e).

(c) Whoever knowingly or willfully gives false information as to his name, address, or period of residence in the voting district for the purpose of establishing his eligibility to register or vote, or conspires with another

individual for the purpose of encouraging his false registration to vote or illegal voting, or pays or offers to pay or accepts payment either for registration to vote or for voting shall be fined not more than $10,000 or imprisoned not more than five years, or both: *Provided, however,* That this provision shall be applicable only to general, special, or primary elections held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives, or Delegates or Commissioners from the territories or possessions, or Resident Commissioner of the Commonwealth of Puerto Rico.

(d) Whoever, in any matter within the jurisdiction of an examiner or hearing officer knowingly and willfully falsifies or conceals a material fact, or makes any false, fictitious, or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

SEC. 12. (a) Whoever shall deprive or attempt to deprive any person of any right secured by section 2, 3, 4, 5, 7, or 10 or shall violate section 11 (a) or (b), shall be fined not more than $5,000, or imprisoned not more than five years, or both.

(b) Whoever, within a year following an election in a political subdivision in which an examiner has been appointed (1) destroys, defaces, mutilates, or otherwise alters the marking of a paper ballot which has been cast in such election, or (2) alters any official record of voting in such election tabulated from a voting machine or otherwise, shall be fined not more than $5,000, or imprisoned not more than five years, or both.

(c) Whoever conspires to violate the provisions of subsection (a) or (b) of this section, or interferes with any right secured by section 2, 3, 4, 5, 7, 10, or 11 (a) or (b) shall be fined not more than $5,000, or imprisoned not more than five years, or both.

(d) Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section 2, 3, 4, 5, 7, 10, 11, or subsection (b) of this section, the Attorney General may institute for the United States, or in the name of the United States, an action for preventive relief, including an application for a temporary or permanent injunction, restraining order, or other order, and including an order directed to the State and State or local election officials to require them (1) to permit persons listed under this Act to vote and (2) to count such votes.

(e) Whenever in any political subdivision in which there are examiners appointed pursuant to this Act any persons allege to such an examiner within forty-eight hours after the closing of the polls that notwithstanding (1) their listing under this Act or registration by an appropriate election official and (2) their eligibilty to vote, they have not been permitted to vote in such election, the examiner shall forthwith notify the Attorney General if such allegations in his opinion appear to be well founded. Upon receipt of such notification, the Attorney General may forthwith file with the district court an application for an order providing for the marking, casting, and counting of the ballots of such persons and requiring the inclusion of their votes in the total vote before the results of such election shall be deemed final and any force or effect given thereto. The district court shall hear and determine such matters immediately after the filing of such application. The remedy pro-

vided in this subsection shall not preclude any remedy available under State or Federal law.

(f) The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this section and shall exercise the same without regard to whether a person asserting rights under the provisions of this Act shall have exhausted any administrative or other remedies that may be provided by law.

SEC. 13. Listing procedures shall be terminated in any political subdivision of any State (a) with respect to examiners appointed pursuant to clause (b) of section 6 whenever the Attorney General notifies the Civil Service Commission, or whenever the District Court for the District of Columbia determines in an action for declaratory judgment brought by any political subdivision with respect to which the Director of the Census has determined that more than 50 per centum of the nonwhite persons of voting age residing therein are registered to vote, (1) that all persons listed by an examiner for such subdivision have been placed on the appropriate voting registration roll, and (2) that there is no longer reasonable cause to believe that persons will be deprived of or denied the right to vote on account of race or color in such subdivision, and (b), with respect to examiners appointed pursuant to section 3 (a), upon order of the authorizing court. A political subdivision may petition the Attorney General for the termination of listing procedures under clause (a) of this section, and may petition the Attorney General to request the Director of the Census to take such survey or census as may be appropriate for the making of the determination provided for in this section. The District Court for the District of Columbia shall have jurisdiction to require such survey or census to be made by the Director of the Census and it shall require him to do so if it deems the Attorney

General's refusal to request such survey or census to be arbitrary or unreasonable.

SEC. 14. (a) All cases of criminal contempt arising under the provisions of this Act shall be governed by section 151 of the Civil Rights Act of 1957 (42 U. S. C. 1995).

(b) No court other than the District Court for the District of Columbia or a court of appeals in any proceeding under section 9 shall have jurisdiction to issue any declaratory judgment pursuant to section 4 or section 5 or any restraining order or temporary or permanent injunction against the execution or enforcement of any provision of this Act or any action of any Federal officer or employee pursuant hereto.

(c) (1) The terms "vote" or "voting" shall include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this Act, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election.

(2) The term "political subdivision" shall mean any county or parish, except that where registration for voting is not conducted under the supervision of a county or parish, the term shall include any other subdivision of a State which conducts registration for voting.

(d) In any action for a declaratory judgment brought pursuant to section 4 or section 5 of this Act, subpenas for witnesses who are required to attend the District Court for the District of Columbia may be served in any judicial district of the United States: *Provided,* That no writ of subpena shall issue for witnesses without the District of Columbia at a greater distance than one hun-

dred miles from the place of holding court without the permission of the District Court for the District of Columbia being first had upon proper application and cause shown.

SEC. 15. Section 2004 of the Revised Statutes (42 U. S. C. 1971), as amended by section 131 of the Civil Rights Act of 1957 (71 Stat. 637), and amended by section 601 of the Civil Rights Act of 1960 (74 Stat. 90), and as further amended by section 101 of the Civil Rights Act of 1964 (78 Stat. 241), is further amended as follows:

(a) Delete the word "Federal" wherever it appears in subsections (a) and (c);

(b) Repeal subsection (f) and designate the present subsections (g) and (h) as (f) and (g), respectively.

SEC. 16. The Attorney General and the Secretary of Defense, jointly, shall make a full and complete study to determine whether, under the laws or practices of any State or States, there are preconditions to voting, which might tend to result in discrimination against citizens serving in the Armed Forces of the United States seeking to vote. Such officials shall, jointly, make a report to the Congress not later than June 30, 1966, containing the results of such study, together with a list of any States in which such preconditions exist, and shall include in such report such recommendations for legislation as they deem advisable to prevent discrimination in voting against citizens serving in the Armed Forces of the United States.

SEC. 17. Nothing in this Act shall be construed to deny, impair, or otherwise adversely affect the right to vote of any person registered to vote under the law of any State or political subdivision.

SEC. 18. There are hereby authorized to be appropriated such sums as are necessary to carry out the provisions of this Act.

SEC. 19. If any provision of this Act or the application thereof to any person or circumstances is held invalid, the remainder of the Act and the application of the provision to other persons not similarly situated or to other circumstances shall not be affected thereby.

Approved August 6, 1965.

MR. JUSTICE BLACK, concurring and dissenting.

I agree with substantially all of the Court's opinion sustaining the power of Congress under § 2 of the Fifteenth Amendment to suspend state literacy tests and similar voting qualifications and to authorize the Attorney General to secure the appointment of federal examiners to register qualified voters in various sections of the country. Section 1 of the Fifteenth Amendment provides. that "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." In addition to this unequivocal command to the States and the Federal Government that no citizen shall have his right to vote denied or abridged because of race or color, § 2 of the Amendment unmistakably gives Congress specific power to go further and pass appropriate legislation to protect this right to vote against any method of abridgment no matter how subtle. Compare my dissenting opinion in *Bell* v. *Maryland,* 378 U. S. 226, 318. I have no doubt whatever as to the power of Congress under § 2 to enact the provisions of the Voting Rights Act of 1965 dealing with the suspension of state voting tests that have been used as notorious means to deny and abridge voting rights on racial grounds. This same congressional power necessarily exists to authorize appointment of federal examiners. I also agree with the judgment of the Court upholding § 4 (b) of

the Act which sets out a formula for determining when and where the major remedial sections of the Act take effect. I reach this conclusion, however, for a somewhat different reason than that stated by the Court, which is that "the coverage formula is rational in both practice and theory." I do not base my conclusion on the fact that the formula is rational, for it is enough for me that Congress by creating this formula has merely exercised its hitherto unquestioned and undisputed power to decide when, where, and upon what conditions its laws shall go into effect. By stating in specific detail that the major remedial sections of the Act are to be applied in areas where certain conditions exist, and by granting the Attorney General and the Director of the Census unreviewable power to make the mechanical determination of which areas come within the formula of § 4 (b), I believe that Congress has acted within its established power to set out preconditions upon which the Act is to go into effect. See, *e. g., Martin* v. *Mott,* 12 Wheat. 19; *United States* v. *Bush & Co.,* 310 U. S. 371; *Hirabayashi* v. *United States,* 320 U. S. 81.

Though, as I have said, I agree with most of the Court's conclusions, I dissent from its holding that every part of § 5 of the Act is constitutional. Section 4 (a), to which § 5 is linked, suspends for five years all literacy tests and similar devices in those States coming within the formula of § 4 (b). Section 5 goes on to provide that a State covered by § 4 (b) can in no way amend its constitution or laws relating to voting without first trying to persuade the Attorney General of the United States or the Federal District Court for the District of Columbia that the new proposed laws do not have the purpose and will not have the effect of denying the right to vote to citizens on account of their race or color. I think this section is unconstitutional on at least two grounds.

(a) The Constitution gives federal courts jurisdiction over cases and controversies only. If it can be said that any case or controversy arises under this section which gives the District Court for the District of Columbia jurisdiction to approve or reject state laws or constitutional amendments, then the case or controversy must be between a State and the United States Government. But it is hard for me to believe that a justiciable controversy can arise in the constitutional sense from a desire by the United States Government or some of its officials to determine in advance what legislative provisions a State may enact or what constitutional amendments it may adopt. If this dispute between the Federal Government and the States amounts to a case or controversy it is a far cry from the traditional constitutional notion of a case or controversy as a dispute over the meaning of enforceable laws or the manner in which they are applied. And if by this section Congress has created a case or controversy, and I do not believe it has, then it seems to me that the most appropriate judicial forum for settling these important questions is this Court acting under its original Art. III, § 2, jurisdiction to try cases in which a State is a party.[1] At least a trial in this Court would treat the States with the dignity to which they should be entitled as constituent members of our Federal Union.

The form of words and the manipulation of presumptions used in § 5 to create the illusion of a case or controversy should not be allowed to cloud the effect of that section. By requiring a State to ask a federal court to approve the validity of a proposed law which has in no way become operative, Congress has asked the State to

---

[1] If § 14 (b) of the Act by stating that no court other than the District Court for the District of Columbia shall issue a judgment under § 5 is an attempt to limit the constitutionally created original jurisdiction of this Court, then I think that section is also unconstitutional.

secure precisely the type of advisory opinion our Constitution forbids. As I have pointed out elsewhere, see my dissenting opinion in *Griswold* v. *Connecticut,* 381 U. S. 479, 507, n. 6, pp. 513–515, some of those drafting our Constitution wanted to give the federal courts the power to issue advisory opinions and propose new laws to the legislative body. These suggestions were rejected. We should likewise reject any attempt by Congress to flout constitutional limitations by authorizing federal courts to render advisory opinions when there is no case or controversy before them. Congress has ample power to protect the rights of citizens to vote without resorting to the unnecessarily circuitous, indirect and unconstitutional route it has adopted in this section.

(b) My second and more basic objection to § 5 is that Congress has here exercised its power under § 2 of the Fifteenth Amendment through the adoption of means that conflict with the most basic principles of the Constitution. As the Court says the limitations of the power granted under § 2 are the same as the limitations imposed on the exercise of any of the powers expressly granted Congress by the Constitution. The classic formulation of these constitutional limitations was stated by Chief Justice Marshall when he said in *McCulloch* v. *Maryland,* 4 Wheat. 316, 421, "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, *which are not prohibited, but consist with the letter and spirit of the constitution,* are constitutional." (Emphasis added.) Section 5, by providing that some of the States cannot pass state laws or adopt state constitutional amendments without first being compelled to beg federal authorities to approve their policies, so distorts our constitutional structure of government as to render any distinction drawn in the Constitution between state and federal power almost meaningless. One

of the most basic premises upon which our structure of government was founded was that the Federal Government was to have certain specific and limited powers and no others, and all other power was to be reserved either "to the States respectively, or to the people." Certainly if all the provisions of our Constitution which limit the power of the Federal Government and reserve other power to the States are to mean anything, they mean at least that the States have power to pass laws and amend their constitutions without first sending their officials hundreds of miles away to beg federal authorities to approve them.[2] Moreover, it seems to me that § 5 which gives federal officials power to veto state laws they do not like is in direct conflict with the clear command of our Constitution that "The United States shall guarantee to every State in this Union a Republican Form of Government." I cannot help but believe that the inevitable effect of any such law which forces any one of the States to entreat federal authorities in far-away places for approval of local laws before they can become effective is to

---

[2] The requirement that States come to Washington to have their laws judged is reminiscent of the deeply resented practices used by the English crown in dealing with the American colonies. One of the abuses complained of most bitterly was the King's practice of holding legislative and judicial proceedings in inconvenient and distant places. The signers of the Declaration of Independence protested that the King "has called together legislative bodies at places unusual, uncomfortable, and distant from the depository of their public Records, for the sole purpose of fatiguing them into compliance with his measures," and they objected to the King's "transporting us beyond Seas to be tried for pretended offences." These abuses were fresh in the minds of the Framers of our Constitution and in part caused them to include in Art. 3, § 2, the provision that criminal trials "shall be held in the State where the said Crimes shall have been committed." Also included in the Sixth Amendment was the requirement that a defendant in a criminal prosecution be tried by a "jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law."

create the impression that the State or States treated in this way are little more than conquered provinces. And if one law concerning voting can make the States plead for this approval by a distant federal court or the United States Attorney General, other laws on different subjects can force the States to seek the advance approval not only of the Attorney General but of the President himself or any other chosen members of his staff. It is inconceivable to me that such a radical degradation of state power was intended in any of the provisions of our Constitution or its Amendments. Of course I do not mean to cast any doubt whatever upon the indisputable power of the Federal Government to invalidate a state law once enacted and operative on the ground that it intrudes into the area of supreme federal power. But the Federal Government has heretofore always been content to exercise this power to protect federal supremacy by authorizing its agents to bring lawsuits against state officials once an operative state law has created an actual case and controversy. A federal law which assumes the power to compel the States to submit in advance any proposed legislation they have for approval by federal agents approaches dangerously near to wiping the States out as useful and effective units in the government of our country. I cannot agree to any constitutional interpretation that leads inevitably to such a result.

I see no reason to read into the Constitution meanings it did not have when it was adopted and which have not been put into it since. The proceedings of the original Constitutional Convention show beyond all doubt that the power to veto or negative state laws was denied Congress. On several occasions proposals were submitted to the convention to grant this power to Congress. These proposals were debated extensively and on every occasion when submitted for vote they were overwhelmingly re-

jected.[3]   The refusal to give Congress this extraordinary power to veto state laws was based on the belief that if such power resided in Congress the States would be helpless to function as effective governments.[4]   Since that time neither the Fifteenth Amendment nor any other Amendment to the Constitution has given the slightest indication of a purpose to grant Congress the power to veto state laws either by itself or its agents.   Nor does any provision in the Constitution endow the federal courts with power to participate with state legislative bodies in determining what state policies shall be enacted into law.   The judicial power to invalidate a law in a case or controversy after the law has become effective is a long way from the power to prevent a State from passing a law.   I cannot agree with the Court that Congress—denied a power in itself to veto a state law—can delegate this same power to the Attorney General or the District Court for the District of Columbia.   For the effect on the States is the same in both cases—they cannot pass their laws without sending their agents to the City of Washington to plead to federal officials for their advance approval.

In this and other prior Acts Congress has quite properly vested the Attorney General with extremely broad power to protect voting rights of citizens against discrimination on account of race or color.   Section 5 viewed in this context is of very minor importance and in my judgment is likely to serve more as an irritant to

---

[3] See Debates in the Federal Convention of 1787 as reported by James Madison in Documents Illustrative of the Formation of the Union of the American States (1927), pp. 605, 789, 856.

[4] One speaker expressing what seemed to be the prevailing opinion of the delegates said of the proposal, "Will any State ever agree to be bound hand & foot in this manner.   It is worse than making mere corporations of them . . . ."   *Id.*, at 604.

the States than as an aid to the enforcement of the Act. I would hold § 5 invalid for the reasons stated above with full confidence that the Attorney General has ample power to give vigorous, expeditious and effective protection to the voting rights of all citizens.[5]

---

[5] Section 19 of the Act provides as follows:

"If any provision of this Act or the application thereof to any person or circumstances is held invalid, the remainder of the Act and the application of the provision to other persons not similarly situated or to other circumstances shall not be affected thereby."