ASSOCIATION OF COMMUNITY ORGA-
NIZATIONS FOR REFORM NOW
(ACORN), et al., Plaintiffs,

v.

James R. EDGAR, et al., Defendants.

LEAGUE OF WOMEN VOTERS OF
ILLINOIS, et al., Plaintiffs,

v.

James R. EDGAR, et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

STATE OF ILLINOIS, et al., Defendants.

LEAGUE OF UNITED LATIN
AMERICAN CITIZENS
(LULAC), Plaintiff,

v.

STATE OF ILLINOIS, et al., Defendants.

Nos. 95 C 174, 95 C 281, 95
C 433 and 95 C 1387.

United States District Court,
N.D. Illinois,
Eastern Division.

March 31, 1995.

Judson H. Miner, Jeffrey Irvine Cummings, Barack H. Obama, Davis, Miner, Barnhill and Galland, P.C., Chicago, IL, for Ass'n of Community Organizations for Reform Now, (Acorn).

Paul William Mollica, Meites, Frackman, Mulder & Buger, Chicago, IL, for League of Women Voters of Illinois.

Tricia A. Tingle, Washington, DC, Michele Marion Fox, U.S. Attorney's Office, Chicago, IL, for U.S.

Arturo Jauregui, Maria Valdez, Mexican American Legal Defense & Educ. Fund, Chicago, IL, for League of United Latin American Citizens.

Roger Philip Flahaven, Clara LeFevour Smith, Illinois Atty. General's Office, Chicago, IL, Tyrone C. Fahner, Lynne M. Raimondo, Fredrick Stuart Levin, Richard Elden Weber, II, Mayer, Brown & Platt, Chicago, IL, for defendants.

*MEMORANDUM OPINION AND ORDER*

SHADUR, District Judge.

All of the plaintiffs in these four actions—initially a group of plaintiffs headed by Association of Community Organizations for Reform Now (in 95 C 174), then another group headed by the League of Women Voters of Illinois ("LWV"[1]) (in 95 C 281), next the United States (in 95 C 433) and finally the League of United Latin American Citizens ("LULAC") (in 95 C 1387)—complain of Illinois' refusal to comply with the mandates of the National Voter Registration Act of 1993

---

1. This Court ordinarily prefers to avoid acronyms in multi-party actions, because the resulting alphabet-soup-like opinions tend to be mindnumbing and to induce confusion. In this instance only LWV and LULAC in addition to the United States need to be mentioned briefly in this opinion, and acronyms rather than "League" are

("Act," 42 U.S.C. §§ 1973gg to 1973gg–10 [2]). For their part defendants (State of Illinois and various of its officials, including Governor Jim Edgar, all of whom are collectively referred to for convenience as the singular proper noun "Illinois") acknowledge that Illinois is one of the tiny group of holdout States in that respect—and Illinois seeks to justify its noncompliance by asserting the Act's unconstitutionality.

Originally the United States moved for a preliminary injunction, and this Court focused the parties' energies toward a hearing on that motion. But now the United States has shifted to a motion for summary judgment under Fed.R.Civ.P. ("Rule") 56 (earlier LWV had filed a like motion in its own action), and that has put the preliminary injunction motion into the background while the parties have completed their Rule 56 submissions.[3] At this point the United States' summary judgment motion (in which each of the other three sets of plaintiffs has joined orally [4]) is ready for decision.[5] For the reasons stated in this memorandum opinion and order, plaintiffs' Rule 56 motion is granted.

### Facts

No outcome-determinative factual disputes exist in the areas that the United States has accurately portrayed as material to the decision in these cases (see Ex. 1 to this opinion, United States' GR 12(M) statement, which this Court finds to be correct in all material respects and therefore adopts). To the ex-

tent that Illinois does not simply admit the United States' GR 12(M) assertions, Illinois' stated objections are often quibbles—and in all events they are legally immaterial. For example, Illinois GR 12(N) ¶ 4 says that some of its driver's license examination stations are temporary voter registration places manned by volunteers, with a majority (about 60%) of its employees appointed as Deputy Registrars. Similarly, Illinois GR 12(N) ¶ 5 says that Illinois provides some volunteer services of the nature called for by Act § 7. But such facts (and all the others that are set out in Illinois' response to the GR 12(M) statement) do not blink the overriding fact that Illinois does not comply with all of the Act's requirements and that it has no intention of doing so.

As for Illinois' lengthy GR 12(N)(3)(b) supplement (to which the United States has not been called upon for a response), it merely sets the framework for the legal arguments that this opinion hereafter finds wanting as a matter of law. Illinois' Paragraphs 1–11 simply summarize the provisions of the Act, its Paragraphs 12–14 recite that the Act provides no opt-out escape hatch, and its Paragraphs 15–89 set out the existing structure of Illinois' governmental units and how they would assertedly have to adapt themselves to respond to the Act. Finally its Paragraphs 90–103 set out Illinois' views (through Executive Director Ronald Michaelson of its State Board of Elections ("Board")) that the Act will undercut its efforts to combat election fraud. But on that last point, it would turn

---

used to identify those organizations because each of them is a "League."

2. In the interest of simplicity citations to the Act will take the form "Act § —," referring to the Act's internal numbering rather than to its placement in Title 42. But conversion to the latter is not difficult: That can be accomplished by following "42 U.S.C. § 1973gg" with a hyphen and then a number that is 2 lower than the Act's internal number (thus, for example, Act § 2 corresponds to 42 U.S.C. § 1973gg and Act § 5 corresponds to 42 U.S.C. § 1973gg–3).

3. For that purpose the parties' filings included the United States' required statement under this District Court's General Rule ("GR") 12(M) and Illinois' required response under GR 12(N).

4. After this opinion was already in substantially final form LULAC delivered its own Rule 56

motion, supporting memorandum and GR 12(M) statement, noticing them up for presentment on March 31. Because this opinion resolves LULAC's case as well as the others, its earlier oral motion to join with the United States will stand, and there is no need for such presentment.

5. At this Court's suggestion Illinois, which had filed a 52-page Brief in Opposition to the United States' Motion for Preliminary Injunction, avoided a major duplication of that effort by not repeating its contents in Illinois' Rule 56 brief. And a good thing, too—Illinois still managed to fill up 32 pages in *that* second effort (so much for the practice of referring to lawyers' work products as "briefs"!). This opinion will cite Illinois' initial effort as "D. Mem. I—" and its most recent filing as "D.Mem. II—."

the Constitution on its head to contend that Illinois' views can prevail over Congress' when it comes to registration of voters for *federal* elections—and nothing in the Act inhibits Illinois' ability to adhere to its own views in connection with its own state and local elections.[6]

As the United States has shown and as Illinois does not effectively contest, Illinois' Board was preparing to implement the Act in late 1994 (before the Act's required compliance date of January 1, 1995). But although the Illinois General Assembly was then in session and was thus able to take whatever action might be necessary for that purpose, those things simply were not done. Instead Illinois balked and decided that it would not take *any* of the additional steps that the Act prescribes.

What Illinois sets out by way of response is really a gauntlet-throwing defense: Essentially it takes the position that it knows better than Congress what should be done to facilitate voter registration (see attached Ex. 2, the December 30, 1994 letter from the office of Governor Edgar to the United States). But the discussion that follows confirms the obvious: that as to registration for federal elections, it is Congress and *not* Illinois whose judgment must control (although under the Constitution Illinois does prescribe the *qualifications* that any voter, either federal or state, must meet before he or she is permitted to register—a principle that is not at all encroached upon by the Act).

#### Constitutionality of the Act

■ This Court writes on a clean slate in the legal sense. Both because only a few states other than Illinois have refused to comply with the Act and because of the short time span that has elapsed since the Act's January 1, 1995 effective date, the only judicial opinion that has addressed the Act's constitutionality is the March 2, 1995 decision of United States District Judge James Ware in *Wilson v. United States,* 878 F.Supp. 1324 (N.D.Cal.). And it is of course conventional wisdom (and we District Judges are regularly reminded by our Court of Appeals) that District Court decisions do not create precedent even at home, let alone abroad (*Colby v. J.C. Penney Co.,* 811 F.2d 1119, 1124 (7th Cir.1987), reconfirmed in such opinions as *In re Smith,* 964 F.2d 636, 638 (7th Cir.1992) and *Gould v. Bowyer,* 11 F.3d 82, 84 (7th Cir.1993)).

Nevertheless *Wilson* provides guidance both because of its identical subject matter and because Illinois, as did California, seeks to rely on *New York v. United States,* —— U.S. ——, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) as assertedly pointing the way to a decision of the Act's unconstitutionality. And as the ensuing discussion reflects, this Court agrees with Judge Ware that *New York* is not at all in point here.

■ To turn to the matter at hand, three provisions of the United States Constitution (not merely in conjunction, but for two distinct analytical reasons) give the lie to Illinois' position. Here is the first clause of Art. I, § 4 (emphasis added):

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; *but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.*[7]

Next Section 5 of the Fourteenth Amendment vests Congress with the power to enforce that Amendment's provisions "by ap-

---

6. Because of what·has been said here as to the nonmateriality of Illinois' factual assertions, this opinion finds it unnecessary to resolve the dispute between LWV and Illinois as to striking certain of the exhibits that Illinois tendered on the earlier preliminary injunction motion. This Court has reviewed and considered those exhibits and finds them insufficient to create a genuine issue of material (that is, outcome-determinative) fact.

7. [Footnote by this Court] Although that provision is literally limited to congressional elections, congressional power extends with equal force to elections of the President and Vice President (cf. *Buckley v. Valeo,* 424 U.S. 1, 14 n. 16, 96 S.Ct. 612, 632 n. 16, 46 L.Ed.2d 659 (1976), citing *Burroughs v. United States,* 290 U.S. 534, 54 S.Ct. 287, 78 L.Ed. 484 (1934)). Accord, Justice Black's opinion in *Oregon v. Mitchell,* 400 U.S. 112, 124 n. 7, 91 S.Ct. 260, 264 n. 7, 27 L.Ed.2d 272 (1970), a view that commanded a clear majority of the Court in that highly-splintered case.

propriate legislation." And of course the Fifteenth Amendment, which has a corresponding enforcement provision in its Section 2, begins with this Section 1:

The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

By definition the Tenth Amendment, on which Illinois stakes its all (that was the foundation stone on which *New York* rested its declaration of unconstitutionality of another statute), does not apply to powers vested in Congress by the Constitution. Thus the earlier-emphasized portion of Art. I, § 4 constitutes the specific voting-regulation counterpart of the general Supremacy Clause contained in Art. VI. And it is of course obvious (and is well recognized in the case law) that legislation implementing the Fourteenth and Fifteenth Amendments, adopted as they were post–Civil–War and well *after* the Tenth Amendment, does not run afoul of the latter (see, e.g., *City of Rome v. United States*, 446 U.S. 156, 178–80, 100 S.Ct. 1548, 1562–63, 64 L.Ed.2d 119 (1980), reaffirming *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976); and see *EEOC v. Wyoming*, 460 U.S. 226, 243 n. 18, 103 S.Ct. 1054, 1064 n. 18, 75 L.Ed.2d 18 (1983)).

Illinois, obviously conscious of the latter soft spot in its defense, devotes fully half (pages 4 to 20) of its D.Mem. II discussion to a vain effort to gloss over the proposition that has just been stated here in the single preceding sentence. But once again length and repetition of discussion cannot substitute

for reasoned analysis. Just as is true of a contract between private parties that is later amended, the compact of federalism between States and the United States that is represented by our Constitution cannot be read as though an *earlier* Amendment (the Tenth) has somehow amended and limited *later* Amendments (the Fourteenth and Fifteenth).

Illinois tries to accomplish that trick by sleight of hand: It urges that the enforcement clause of the Fourteenth Amendment confers "the same broad powers as the Necessary and Proper Clause, Art. I, § 8, cl. 18" (*Katzenbach v. Morgan*, 384 U.S. 641, 650, 86 S.Ct. 1717, 1723, 16 L.Ed.2d 828 (1966))—and presumably because the original body of the Constitution (including the Necessary and Proper Clause) antedated the Tenth Amendment, we are somehow supposed to conclude that the Tenth Amendment trumps the later-adopted Civil War Amendments. Like any clumsily handled shell game, that simply won't deceive the perceptive observer.[8] That is *not* the thrust of the numerous cases that have rejected Tenth Amendment challenges to voting statutes that draw their sustenance from those later Amendments. More on this subject a bit later.

But to return to the first line of constitutional support for the Act (Art. I, § 4), more than 60 years ago a unanimous Supreme Court said this about that constitutional provision in *Smiley v. Holm*, 285 U.S. 355, 366–67, 52 S.Ct. 397, 399, 76 L.Ed. 795 (1932) (emphasis added):

The subject matter is the "times, places and manner of holding elections for Senators and Representatives." It cannot be

---

8. In one of the numerous ironies (and inaccurate characterizations of legal precedents) that mark Illinois' submissions, its D.Mem. II–10 to 12 cites to and quotes from Justice Brennan's plurality opinion in *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 16–17, 109 S.Ct. 2273, 2282–83, 105 L.Ed.2d 1 (1989) as though it "puts firmly to rest any notion that Congress has broader powers under the Fourteenth Amendment than it does under Article I" (D.Mem. II–11). But that is simply bogus—although four Justices shared Justice Brennan's views in that portion of his opinion (which were not as simplistic as Illinois would have it in any event), five Justices did not. Indeed, four of the Justices who did *not* join in

that portion of Justice Brennan's opinion expressly emphasized the temporal analysis that is set out in the text of this opinion (491 U.S. at 41–42, 109 S.Ct. at 2302–03), pointing to *Fitzpatrick v. Bitzer* as the key authority in that respect. Because Justice Brennan's plurality opinion also relied on *Fitzpatrick* as a major linchpin for its position (*id.* at 16–18, 109 S.Ct. at 2282–84), the lesson that plainly emerges from *Union Gas* is that *eight* Justices (and hence the Court itself) continue to regard *Fitzpatrick* as controlling precedent in the area now under discussion in this opinion (Justice White, then the ninth Justice and hence the swing vote, had no occasion to speak to *Fitzpatrick*, in light of his view on the merits).

doubted that these comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, *registration,* supervision of voting, protection of voters, *prevention of fraud and corrupt practices,* counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved.

*   *   *   *   *   *

This view is confirmed by the second clause of Article I, section 4, which provides that "the Congress may at any time by law make or alter such regulations," with the single exception stated. The phrase "such regulations" plainly refers to regulations of the same general character that the legislature of the State is authorized to prescribe with respect to congressional elections. *In exercising this power, the Congress may supplement these state regulations or may substitute its own. . . . It 'has a general supervisory power over the whole subject.'*

That of course is precisely what Congress has done in the Act. It is a total mischaracterization for Illinois to attempt to portray the Act as prescribing the "qualifications" of voters (a power that is granted to the States' legislatures by Art. I, § 2). Not a word in the Act purports to impinge on the States' power to define what *qualifications* a voter must have, as contrasted with expanding the ability of voters who possess such State-defined qualifications to exercise their franchise.[9]

Illinois urges that it knows better than Congress the risks of voter fraud, so that it should not be required to comply with the congressional directives as to the means for registration, such as doing so in conjunction with motor vehicle driver's license applications (Act § 5) or by mail (Act § 6) or in conjunction with obtaining public assistance and services for the disabled (Act § 7). Apart from the degree of presumptuousness that Illinois' position in that regard might perhaps be thought to reflect, the short answer is that such decisions as to elections for *federal* office (the express subject matter of the Act, as each of its sections specifies in unambiguous terms) are for Congress and not for Illinois to make (indeed, the earlier—quoted excerpt from *Smiley* specifically mentioned "prevention of fraud and corrupt practices" as a subject within congressional authority for federal elections).

■ If Illinois really has the belief that its current filings represent, it may implement that belief not by disobeying the law as to federal elections but rather by maintaining (if it wishes) a separate voting registration record to preserve the purity of its state and local elections.[10] That type of dual structuring was exactly what the Court's majority in *Oregon v. Mitchell,* which upheld Voting Rights Act requirements for federal elections but not for state elections, produced. And if Illinois were indeed to choose such a path, it could not of course complain of the expense

---

9.  In a classic nonsequitur D.Mem. I–2 states:

    > Control over voter qualifications—and hence voter registration—is reserved by the Constitution exclusively to the States.

    That ipse dixit, in making a quantum leap from "voter qualifications" to "hence voter registration," is at war with both the English language and common sense. Nor does it gain credence by its essential repetition at D.Mem. II–3, for the reiteration of a false equation does not make it true. In much the same way, D.Mem. I–20 to 23 not only seeks to draw sustenance by patching together opinions (including dissenting opinions) in *Oregon v. Mitchell,* but it does so as to legislation that at least arguably dealt with voter *qualifications* (such as voters' age), as the Act plainly

does not. That Illinois argument is thus doubly poverty-stricken.

10. This Court may perhaps be pardoned for taking a somewhat jaundiced view of that holier-than-thou stance. It has been the common perception for years (particularly in the pre-*Shakman*-decree days when the Democratic machine had a tight control on Chicago and, before more recent population shifts, on Cook County as a result) that close statewide elections would come down to a battle between the Chicago Democratic machine and various downstate Republican-dominated counties as to who could hold back its voting returns longer to see how many votes were needed to deliver victory. Vote fraud, like beauty, may lie in the eye of the beholder.

entailed in maintaining and implementing its views for its own elections.[11]

■ What has been said to this point scotches Illinois' reliance on the Tenth–Amendment–based decision in *New York.* In fact, *New York* itself confirmed (— U.S. at ——, 112 S.Ct. at 2417) (emphasis added)):

> In a case like this one, involving the division of authority between federal and state governments, the two inquiries are mirror images of each other. *If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States;* if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress.

Because the last half of the first clause of Art. I, § 4 *is* such a power expressly delegated to Congress, and because the Act involves an exercise of that power (as *Smiley* confirms), *New York* is entirely inapropos here.

■ This alone would suffice to compel victory for the United States and its fellow plaintiffs and defeat for Illinois and its officials. But as already indicated, the Civil War Amendments (the Fourteenth and Fifteenth) independently compel the same conclusion. Those Amendments sought to erase pre-existing discrimination by extending the franchise to blacks. Implementation of that purpose validated the Voting Rights Act of 1965 (42 U.S.C. § 1973), and the current Act was aimed at the same target of disproportionately lower voter participation by racial minorities (see Act § 2(a)(3) [12]). In addition to such cases as *City of Rome,* which Illinois somewhat astonishingly quotes in part (albeit in trying unsuccessfully to distinguish what the Court held there),[13] see *South Carolina v. Katzenbach,* 383 U.S. 301, 324, 86 S.Ct. 803, 816, 15 L.Ed.2d 769 (1966):

> The language and purpose of the Fifteenth Amendment, the prior decisions construing its several provisions, and the general doctrines of constitutional interpretation, all point to one fundamental principle. As against the reserved powers of the States, Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting.

Accord, *Gregory v. Ashcroft,* 501 U.S. 452, 468, 111 S.Ct. 2395, 2404, 115 L.Ed.2d 410 (1991), reconfirming the pronouncement in 100 S.Ct. at 1562–63 (footnotes omitted) as something merely "suggested" by the Supreme Court:

> We agree with the court below that *Fitzpatrick* stands for the proposition that principles of federalism that might otherwise be an obstacle to congressional authority are necessarily overridden by the power to enforce the Civil War Amendments "by appropriate legislation." Those Amendments were specifically designed as an expansion of federal power and an intrusion on state sovereignty. Applying this principle, we hold that Congress had the authority to regulate state and local voting through the provisions of the Voting Rights Act. *National League of Cities [v. W.J. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976)], then, provides no reason to depart from our decision in *South Carolina v. Katzenbach* that "the Fifteenth Amendment supersedes contrary exertions of state power," 383 U.S., at 325, [86 S.Ct. at 817], and that the Act is "an appropriate means for carrying out Congress' constitutional responsibilities," *id.,* at 308 [86 S.Ct. at 808].

If that is a "suggestion" (presumably something ranking with or below a dictum), what pray tell would constitute a "holding"?

---

11. It should of course be emphasized that Illinois could not carry out its obligations under the Act in a way that would subvert the Act's purposes (as, for example, by leaving voters unclear as to their federally-conferred and federally-guaranteed voting rights through the various means of registration prescribed by the Act).

12. Illinois seeks to quarrel with Congress' findings by pointing to Illinois' favorable performance in terms of black v. white voters' registration rates (D.Mem. II–17 to 18). But it is not for the judiciary to resolve factual disputes as to the soundness of the underpinnings for congressional enactments. On the contrary, the test for the validity of federal statutes in this area (as in all others) is whether *any* rational basis exists for Congress' action (see, e.g., the *South Carolina* case next cited and quoted in the text and *FCC v. Beach Communications,* cited a bit later in the text). And there is surely no requirement that Congress must carve out of a statute of general applicability any covered party that can prove that it does not in fact fit within what Congress has found to be a problem calling for a general response (see, e.g., *Vance v. Bradley,* 440 U.S. 93, 108, 99 S.Ct. 939, 948, 59 L.Ed.2d 171 (1979) and cases cited there).

13. D.Mem. II–7 characterizes a portion of this language in *City of Rome,* 446 U.S. at 179–80,

*EEOC v. Wyoming* "that the principles of federalism that restrain Congress' exercise of its Commerce Clause powers are attenuated when Congress acts pursuant to its powers to enforce the Civil War Amendments ... because those 'Amendments were specifically designed as an expansion of federal power and an intrusion on state sovereignty.'"

■ And the same principles that defeat Illinois' effort to rely on the Tenth Amendment also compel rejection of its claim that the Act impermissibly reorganizes state government.[14] By their very nature, both the interrelationship between the two portions of the first clause of Art. I, § 4 and the very existence of the Fourteenth and Fifteenth Amendments contemplate that state officials must act at the direction of Congress in the conduct of federal elections (and hence must act in accordance with congressionally enacted regulations leading to the conduct of such elections (see, e.g., 42 U.S.C. §§ 1973aa–1 and 1973bb, upheld in *Oregon v. Mitchell;* cf. *Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969)).

■ Legislative line-drawing is inherently a matter of creating categories rather than dealing with each situation on a case-by-case basis. In this instance Congress' decision was to exempt from the Act only those States (1) that had no voter registration requirement at all for any of their voters for federal offices as of March 11, 1993 and thereafter or (2) that permitted, during the same time frame, all of their voters to register at the time that any federal election was held. All other States (Illinois included) would have to adapt their registration machinery (but *not* their definitions of voter qualifications[15]) to the Act's requirements. That was surely a rational classification, and hence it must be upheld under classic constitutional doctrine

(see *FCC v. Beach Communications, Inc.,* — U.S. —, — – —, 113 S.Ct. 2096, 2101–02, 124 L.Ed.2d 211 (1993) for an extensive exposition—including a host of citations—reconfirming that principle).

### Conclusion

In summary, *New York* cannot remotely be viewed as carrying the baggage that Illinois seeks to load on that decision. From more than one perspective the Act plainly passes constitutional muster. There is no genuine issue of material fact, and the United States is (and the plaintiffs in each of the other three cases are) entitled to a judgment as a matter of law.

In accordance with the prayer for relief contained in the United States' Complaint, this Court therefore:

1. declares that Illinois and its individual codefendants are not in compliance with the Act;

2. declares that all provisions of Illinois law or regulations that conflict with the Act are pre-empted by the Act;

3. enjoins the individual defendants, their agents and successors in office and all persons acting in concert with any of them from failing or refusing to comply with the requirements of the Act; and

4. orders the individual defendants, their agents and successors in office and all persons acting in concert with any of them promptly:

(a) to designate a chief state election official to be responsible for coordination of Illinois' responsibilities as required under Act § 10 and to delegate to such individual all necessary powers to achieve such compliance;[16]

(b) to take all steps necessary to allow individuals to register to vote in federal

---

**14.** David Orr ("Orr"), the County Clerk of Cook County, has filed an affidavit (United States GR 12(M) Statement Ex. 3) that minimizes any such dramatic impact on Illinois' officials and on the procedures that they would have to follow to comply with the Act. Illinois vigorously disputes Orr's assertions. This opinion, however, need not credit Orr's views to reach the conclusions announced here, and this Court has not done so for purposes of the current motion.

**15.** It is frankly tiresome to have to repeat this parenthetical. But repetition breeds repetition—

that is, there is no better way to counter Illinois' frequent reiteration of its mischaracterization of the Act than to reemphasize the falsity of that characterization.

**16.** *LWV's motion for preliminary injunction had suggested as an alternative to this provision that this Court appoint a special master to perform the coordination duties under Act § 10 until Illinois comes into compliance in that respect. Because every day's delay in implementing the Act involves the potential disenfranchisement of otherwise eligible voters, that suggestion has sub-*

elections as part of the driver's license application process, when applying for assistance at specified state agencies, and by mail-in registration as is required by the Act;

(c) to take all steps necessary to ensure (1) that no individual's registration to vote in federal elections is cancelled for failure to vote and (2) that Illinois employs the procedures outlined by Act § 8(d) before cancelling any individual's registration to vote in federal elections, unless the individual's registration is cancelled by reason of death, criminal conviction, mental incapacity or at the registrant's request; and

(d) to ensure that individuals who move within the same registrar's jurisdiction remain eligible to vote in federal elections even if they have not notified the registrar before the election.

This Court sets a status hearing at 8:45 a.m. April 3, 1995 for purposes of discussing the actions that Illinois contemplates taking in response to this opinion and, relatedly, to discuss the possible appropriateness of this Court's appointment of a special master as mentioned in n. 15.

### EXHIBIT 1

United States District Court Northern District of Illinois Eastern Division

Acorn, et al., Plaintiffs,

v.

Jim Edgar, et al., Defendants,

United States of America, Plaintiff,

v.

State of Illinois, et al., Defendants.

Civil Action No. 95 C 0174

Judge Milton I. Shadur

Civil Action No. 95 C 0433

Judge Milton I. Shadur

RULE 12(M) STATEMENT OF UNCONTESTED FACTS OF PLAINTIFF UNITED STATES OF AMERICA

In conjunction with the motion of the plaintiff, the United States, for summary judgment against the defendant the State of Illinois, et al., and in compliance with Local Rule 12(M), Local Rules of the United States District Court for the Northern District of Illinois the plaintiff contends that there is no genuine issues as to the following material facts:

### I.

The Attorney General of the United States, hereinafter ("The United States") is charged with enforcing The National Voter Registration Act of 1993 ("NVRA" or "Act"), 42 U.S.C. 1973–gg. 42 U.S.C. 1973gg–9(a). (Answer, Ex. 1, ¶1; text of NVRA, Ex. 2.)

### II.

This Court has subject matter jurisdiction over the parties. (Answer, Ex. 1, ¶2.)

### III.

The State of Illinois is one of the fifty states of the United States and is in violation of the NVRA. (Answer, Ex. 1, ¶3, ¶13, ¶15, ¶17, ¶21, ¶23; Affidavit of David Orr, Ex. 3, ¶6, ¶9, ¶10, ¶11, ¶13.)

### IV.

Section 5 of the NVRA requires Illinois and other states to provide simultaneous application for motor vehicle driver's licenses and for registration of voters for elections for federal office. 42 U.S.C. 1973gg–3. Defendants do not provide simultaneous application for voter registration for federal elections and application for motor vehicle driver's licenses as required under the NVRA. (Answer, Ex. 1, ¶7; Affidavit of David Orr, Ex. 3, ¶13.)

### V.

Section 7 of the NVRA requires that Illinois and other states establish procedures for registration of voters in elections for federal

stantial force and calls for further input from the parties.

office at federal, state and nongovernmental agencies designated by the state. 42 U.S.C. 1973gg–5(a). The designated agencies must include agencies which provide public assistance and serve people with disabilities. Section 7(a)(2); 42 U.S.C. 1973gg–5(a)(2). The procedures utilized at these agencies must include asking applicants whether they wish to register to vote, and providing assistance as needed. Section 7(a)(4)(A); 42 U.S.C. 1973gg–5(a)(4)(A). Defendants do not provide registration for voters in elections for federal office at federal, state and nongovernmental agencies designated by the state as required under the NVRA. (Answer, Ex. 1 ¶ 8; Affidavit of David Orr, Ex. 3. ¶ 10.)

## VI.

Section 6(a) of the NVRA requires states to accept and use the mail voter registration form prescribed by the Federal Election Commission (hereinafter the "FEC"). 42 U.S.C. 1973gg–4(a). Section 6(a) of the NVRA also allows states to develop their own forms, in addition to the FEC form, for registering voters in elections for federal office, provided, *inter alia*, that the state form requires only such identifying information and other information as is necessary to enable state election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process, and does not include any requirement for notarization. 42 U.S.C. 1973gg–4(a)(2). Defendants do not accept mail-in registration forms which comply with the NVRA. Defendants' state law does not permit acceptance of mail in registration forms as required by the NVRA. (Answer, Ex. 1, ¶ 17; Affidavit of David Orr, Ex. 3, ¶ 9.)

## VII.

Section 8(b)(2) of the NVRA prohibits the removal of persons registered to vote in elections for federal office from voter registration lists for failure to vote. 42 U.S.C. 1973gg–6(b)(2). Defendants remove names of registered voters from the rolls for failure to vote. (ILL.REV.STAT. chapter 10, § 5/4–

17 and § 5/5–24, Ex. 4; Affidavit of David Orr, Ex. 3, ¶ 6.)

## VIII.

Section 8(a)(3) of the NVRA provides that voters may be removed from the registration rolls only at their request, or due to criminal conviction, death, mental incapacity, or change of address. 42 U.S.C. 1973gg–6(a)(3). Defendants admit that registered voter's names may be removed in Illinois for additional reasons than those specified in the NVRA. (Answer, Ex. 1, ¶ 21; Affidavit of David Orr, Ex. 3, ¶ 6.)

## IX.

Section 8(a)(3) further provides specific procedures which must be followed in order to cancel an individual's registration where it appears that the registrant has moved. 42 U.S.C. 1973gg–6(a)(3). States are prohibited from taking steps to cancel the registration of voters for federal elections under any method which is not in accordance with the NVRA. Section 13 of the NVRA, 42 U.S.C. 1973gg. Defendants admit that they do cancel registration for reasons other than those specified in the NVRA. (Answer, Ex. 1, ¶ 21; Affidavit of David Orr, Ex. 3, ¶ 6; ILL.REV. STAT. chapter 10 § 5/4–12, § 5/5–15, § 5/6–56, § 5/6–38, 5/6–44, Ex. 5; State Board of Elections, Memorandum Ex. 6.)

## X.

Section 10 of the NVRA requires states to designate a state officer or employee as the chief state election official to be responsible for coordination of state responsibilities under the NVRA. Defendants have not designated a state election official as the chief election official to be responsible for coordination of state responsibilities under the NVRA. (Answer, Ex. 1, ¶ 23, Affidavit of David Orr, Ex. 3, ¶ 11.)

## XI.

Defendants admit in their Answer to Compliant, Affirmative Defenses and Counterclaim, that they will not allow Illinois citizens the opportunity to register to vote under the NVRA unless the state code presently per-

mits such registration or unless the state legislature authorizes such a provision in their election code. (Answer, Ex. 1, ¶ 26.)

## XII.

Defendants will allow counties to continue purging persons registered to vote until ordered by the Court. (Answer, Ex. 1, ¶ 26; Affidavit of David Orr, Ex. 3.)

## XIII.

The State Board of Elections' [hereinafter "Board"] prepared to implement the NVRA in late 1994. For example the board sponsored a staff training workshop covering the implementation of the NVRA on November 30 through December 2, and the board scheduled a NVRA workshop for state agencies and the secretary of state employees. (State Board of Elections' Memorandum and Drafted Rules, Ex. 7; and the State Board of Election' transcripts of a December 12, 1994, Ex. 8.)

## XIV.

On December 12, 1994, the Board declined to implement the administrative procedures which would effectuate compliance with the NVRA (State Board of Election's transcripts of December 12, 1994, Ex. 8.)

## XV.

On December 30, 1994, the State of Illinois informed the United States that Illinois would not be in a position to implement the NVRA by January 1, 1995. (Ex. 9.)

Respectfully submitted,

DEVAL L. PATRICK
Assistant Attorney General
Civil Rights Division
JAMES B. BURNS
United States Attorney
/s/ Tricia A. Tingle
ELIZABETH JOHNSON
BARRY H. WEINBERG
TRICIA A. TINGLE

Attorneys, Voting Section
Civil Rights Division
Department of Justice
P.O. Box 66128
Washington, D.C. 20035–6128
(202) 514–4838

## EXHIBIT 2

State of Illinois

Office of The Governor

Springfield 62706

Jim Edgar
Governor

December 30, 1994

Loretta King
Acting Assistant Attorney General
Civil Rights Division
U.S. Department of Justice
Washington, D.C. 20035

Dear Ms. King:

Thank you for your inquiry of December 9. As you noted, the Illinois legislature has indeed adjourned for the year without having adopted legislation amending the Illinois Election Code to reconcile it with the conflicting provisions of National Voter Registration Act of 1993, 42 U.S.C. 1973gg (hereafter "NVRA").

Absent enabling state legislation, the State of Illinois will not be in a position to fully implement the procedures contemplated by the NVRA as of January 1st, 1995.

This does *not*, however, mean that Illinoisans will encounter difficulties in registering to vote for any election, whether federal, state, or local, as of January 1st. On the contrary, the State of Illinois has in the past and will continue to actively encourage all eligible citizens to register to vote, and to make access to registration as available as possible within the reasonable requirements of existing state law.

As you may know, Illinois has an aggressive voter registration system. There are

over 2,700 civic groups in Illinois which have been certified as deputy registrars. In addition, the following persons are entitled to serve as deputy registrars: labor union designees, designated employees of corporations, high school and elementary principals, librarians, college presidents, municipal and township clerks and over 22,000 precinct committeemen. Illinois law authorizes the Departments of Public Aid and Employment Security and the Secretary of State (motor vehicles) to establish deputy registrars within the offices of these agencies that service the general public. The Illinois Department of Public Aid has instituted a pilot program incorporating voter registration activities into the application process for public assistance. The Secretary of State affords voter registration opportunities at each of its 111 Driver Services facilities using state employees who have volunteered to become Deputy Voter Registrars. This Driver Services facilities program, begun in 1991, has registered over 100,000 individuals to vote. In addition to the ongoing efforts of these State agencies, State officials allow local registration groups to independently set up voter registration tables at designated State facilities.

Among the additional measures the State of Illinois intends to take to help assure access to registration, within the confines of existing state law, include: directing additional state agencies to make space available in state facilities for voter registration drives and groups and dissemination of pamphlets and lists of regional directories of voter registration offices and sites.

Illinois has a well codified and smooth working process of conducting voter registration and voter canvassing. Over 6 million Illinoisans are currently registered to vote. Higher levels of voter registration are sustained by the media outreach efforts and periodic voter registration drives, launched by civic, political and governmental officials. Accurate voter registration lists are maintained through a codified and carefully developed system of voter canvassing and, as appropriate, de-registration or re-registration. Illinois' present procedures for notice to voters whose addresses cannot be confirmed and for placing those voters in suspense files, from which they may be easily restored to active voting status, are similar in purpose and design to the provisions of the NVRA.

In sum, Illinois provides its citizens with many opportunities for simple and convenient voter registration through an aggressive system of outreach, access and information and well codified processes designed to maintain election-related opportunity and integrity.

Sincerely,
/s/ William Ghesquiere
William Ghesquiere
Deputy Counsel to the Governor

cc:

Honorable George Ryan

Dr. Ronald Michaelson